SIXTH DIVISION
December 14, 2007

No. 1-05-2822

| | | |
|---|---|---|
| VERNON HUDSON, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | Appeal from the |
| | ) | Circuit Court of |
| THE CITY OF CHICAGO, a Municipal | ) | Cook County, Illinois. |
| Corporation, | ) | |
| | ) | No. 01 L 6424 |
| Defendant-Appellant and | ) | |
| Third-Party Plaintiff-Appellant, | ) | Honorable |
| | ) | Irwin J. Solganick |
| (James Scott, | ) | Judge Presiding. |
| | ) | |
| Third-Party Defendant-Appellee). | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

_____JUSTICE JOSEPH GORDON delivered the opinion of the court:

Plaintiff, Vernon Hudson, brought suit against defendant, the city of Chicago (the City),

and a Chicago police officer, Sung Joo Lee, alleging in two counts that Officer Lee, through

negligence and willful and wanton conduct, caused an automobile collision that left Hudson with

serious and permanent injuries including paraplegia.  Hudson voluntarily dismissed Officer Lee

prior to trial and the case proceeded with the City as the sole defendant.  The jury found for

Hudson on both counts and awarded damages of over $17.5 million.  In addition to the general

verdict, the jury answered two special interrogatories.  The City now appeals, arguing that it was

entitled to judgment not withstanding the verdict because it was immune under the Local

Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/1-101 *et seq.*

No. 1-05-2822

(West 2004)) (Tort Immunity Act) from liability for negligence, and because the police officer's conduct was not willful and wanton. The City alternatively argues that it is entitled to a new trial because the trial court improperly allowed Hudson's expert to show a computer simulation of the accident to the jury, because the jury was not properly instructed on what constitutes willful and wanton conduct, and because plaintiff's attorney improperly advised the jury how to answer one of the special interrogatories. For the reasons that follow, we affirm.[1]

## I. BACKGROUND

Hudson's fourth amended complaint alleged that the City was liable for his injuries under two theories. In count I, Hudson alleged that Officer Lee was negligent in the following respects:

"a. Exceeded maximum speed limits endangering life and property;

b. Failed to activate sirens, mars lights or emergency signals;

c. Drove her motor vehicle in a manner causing it to lose control and strike Vernon Hudson;

d. Improperly executed a lane change striking Vernon Hudson's motor vehicle;

e. Failed to exercise due care in operation of her vehicle; and

f. Failed to maintain a proper lookout for traffic then and there upon the highway."

Count II of the complaint alleged that Officer Lee's conduct was willful and wanton in the

___

[1]The City's third-party action against third-party defendant-appellee, James Scott, is not part of this appeal.

No. 1-05-2822

following respects:

"a. Failed to operate the motor vehicle at a speed and in a manner compatible with conditions to ensure that control of the motor vehicle is maintained at all times, in violation of General Order 97-3;

b. Improperly engaged in caravaning [*sic*] when it was not safe to do so, in violation of General Order 97-3;

c. Improperly participated in a pursuit when she was not authorized to do so in violation of General Order 97-3;

d. In violation of General Order 97-3, drover [*sic*] her motor vehicle without due regard for the safety of all persons on the highway, including Vernon Hudson;

e. Drove her motor vehicle in a manner causing it to strike Vernon Hudson;

f. Recklessly failed to maintain control over her vehicle;

g. Recklessly executed a lane change striking Vernon Hudson's motor vehicle; and

h. In violation of General Order 97-3, failed to adhere to basic traffic safety practices by moving into lane #1 when it was not safe to do so;

i. In violation of General Order 97-3, used the activity of 'following' as a subterfuge for a vehicle pursuit;

j. In violation of General Order 97-3, improperly engaged in the pursuit

3

when the volume of vehicle traffic made it unsafe; and

k. Failed to abandon the vehicle pursuit when it was the most reasonable

course of action in violation of General Order 97-3."

Hudson's claims proceeded to trial on March 11, 2005. Hudson testified that on the night of the accident, May 7, 2001, he left his job as a truck mechanic at about 8:20 p.m., entered the Eisenhower expressway at Damen, and headed west in the rightmost of the four westbound lanes. He stated that somewhere around Kedzie, he heard sirens and saw flashing lights coming from behind him, so he put his turn signal on and pulled over to the right shoulder. Hudson stated that a car had pulled onto the shoulder immediately in front of him so that he had drive beyond that car to get onto the shoulder. He said that his car was "all the way over" onto the shoulder, except that "just the left rear tire might have been on the line." Hudson stated that it was at that point his car was hit, but that he could not remember anything further until he woke up in the hospital sometime later. On cross-examination, Hudson stated that the weather on the night of the accident was dry and clear.

Officer Lee testified on direct examination as an adverse witness that, at the time of the occurrence, she was familiar with the police department general order 97-3, which described under what circumstances police officers could engage in motor vehicle pursuits.

General order 97-3 was entered into evidence and the plaintiff's counsel had Officer Lee read the following provisions aloud:

"These procedures provide Department members with guidelines to follow

when engaged in a motor vehicle pursuit. *** Members must be cognizant of the

fact that motor vehicle pursuits are a serious matter with a potential for death and/or injury to the officers, persons in the vehicle being pursued, and/or innocent persons in the area and property damage.

    ***

Police officers operating unmarked Department vehicles will be permitted to engage in a motor vehicle pursuit only when the fleeing motor vehicle or its occupants represent an immediate and direct threat to life. Whenever a marked Department vehicle becomes available to take over a vehicle pursuit, the unmarked Department vehicle operator will withdraw as the primary pursuit unit and only, with the approval of a supervisor assigned to the pursuit, assume the role of secondary pursuit unit.

    ***

At no time will an officer use the activity of 'following[2] as a subterfuge for a vehicle pursuit.

An active pursuit will involve no more than a primary and secondary pursuit unit unless otherwise directed by a supervisor. All other units will remain aware of the direction and progress of the pursuit, but will not actively participate,

---

[2]The order defines "following" as "the discreet operation of a police vehicle, in compliance with all traffic laws, behind a motor vehicle. Following is employed so that the member can gather more information about the vehicle or its occupants in order to make an informed decision about whether to effect a stop."

and will not respond or parallel the pursuit on adjacent streets, unless specifically authorized to do so.

\*\*\*

The decision to initiate a pursuit rests with the individual officer. The Department member will only engage in a motor vehicle pursuit when:

\*\*\*

d. The necessity of immediate apprehension outweighs the level of inherent danger created by the pursuit;

e. the speeds involved and/or the maneuvering practices engaged in, permit the Department vehicle operator complete control of his vehicle and do not create unwarranted danger to himself or others;

f. the volume of pedestrian and/or vehicular traffic permits continuing the pursuit.

The decision to abandon a vehicle pursuit may be the most reasonable course of action. Officers and their supervisors must continually evaluate the nature of the pursuit in light of its danger and make a judgment to terminate the pursuit, whenever necessary. A pursuit will be immediately terminated whenever:

\*\*\*

Speeds involved, volume of pedestrian and/or vehicular traffic, presence of weather and/or road hazards or the distance between vehicles indicates that further pursuit will unnecessarily endanger the public and/or Department members.

\*\*\*

The following activities are prohibited during the course of a vehicle pursuit:

\*\*\*

c. caravanning[3] (unless authorized by a supervisor).

\*\*\*

(e) the foregoing provisions do not relieve the driver of an authorized emergency vehicle from the duty of driving with due regard for the safety of all persons, nor do such provision protect the driver from the consequences of his reckless disregard for the safety of others.

\*\*\*

The operation of an authorized emergency vehicle does not relieve the driver from the responsibility of driving with due regard for the safety of all persons.

Any Department vehicle operator who is involved in an accident while responding to an emergency situation will be required to justify his actions.

When responding to an emergency situation or assignment, the sworn Department vehicle operator of a marked vehicle will:

\*\*\*

---

[3]The order defines "caravanning" as "the following and direct participation in a pursuit by more than two police vehicles."

7

2. adhere to basic traffic safety practices.

3. operate the vehicle at a speed and in a manner compatible with weather and local conditions to ensure that control of the vehicle is maintained at all times."

Officer Lee testified that she was not in pursuit of the fleeing suspect and was not "following as a subterfuge" for pursuit in violation of the general order. Rather, she stated that she was attempting to "assist" the other officers who were actually doing the pursuing. Officer Lee admitted, however, that she had never been trained in "assisting."

Officer Lee stated that on the day of the accident she was at the 11th district police station at Kedzie and Harrison with Officer Howard Ray. She said that they had been processing an arrestee and were just leaving the station when they heard a call over the police radio that a homicide suspect in a white van was being pursued on the eastbound lanes of the Eisenhower expressway. Officer Lee acknowledged that the radio dispatcher did not request her participation in the pursuit and that she did not advise her supervisor or the radio dispatcher that she was going to participate in the pursuit. She denied any intention to actively participate in the pursuit and stated that she was not required to advise anyone that she was going to enter the area in which the pursuit was taking place.

Officer Lee testified that, prior to the collision, she and Officer Ray entered the eastbound lanes of the expressway and were traveling for a few minutes when they heard on their police radio that the suspect had turned around and begun to travel in the opposite direction in the westbound lanes. Officer Lee said that they then correspondingly exited the eastbound lanes at Western Avenue and reentered the westbound lanes. She stated that she heard the sirens of other

police cars when reentering the expressway, but she was not sure that she saw any of them. She said that she never saw the white van being pursued.

Officer Lee described that when she was entering the westbound expressway, there were "a lot of citizen" cars. She did not change lanes right away, but at some point changed from lane 1, the rightmost lane which she had initially entered, to lane 2, immediately to the left. She stated that she subsequently moved back to lane 1, where the collision occurred. Officer Lee stated that there was traffic "all around" and "they were moving with me." She said that she did not recall whether civilian cars were passing her, but that "they must [have been]. I didn't pay attention to other cars that much." She said that as she was driving on the expressway before the collision, "some cars were going to the right [apparently to yield, but that] some cars were going straight." Officer Lee further stated that at some point prior to the collision she had activated her emergency lights and specifically recalled checking to make sure they were on.

In describing the collision, Officer Lee stated that she had just completed her lane change from lane 2 back to lane 1 when she saw Hudson's car pulling out in front of her from the shoulder. She said she immediately applied the brakes but that she struck the rear of Hudson's car. She said that she lost control of her car after she applied her brakes. In response to questions from plaintiff's counsel about whether anything prohibited her from seeing Hudson's car prior to the collision, she stated: "I was not necessarily looking if someone will merge into my lane from the shoulder." She further stated: "I wasn't looking at the *** lane that I was going in. I was looking at the car in front of me. I looked at the rear mirror, I looked at the side mirror, I looked back. When I knew that it was clear in my lane, I made my lane change." Officer Lee

stated that she had been traveling at approximately 45 to 50 miles per hour.

On cross-examination by counsel for the City, Officer Lee stated that at the time of the accident, she believed that the she could help "avert or reduce the seriousness of the situation." She explained:

"It could be as little as traffic control because the offender was going back on and off the expressway going east and west. Citizens are not aware of this. So officers in that area can help the citizens not to get injured *** and also *** it could be that when the officers are affecting arrest on that offender, he might *** grab a girl on the street or citizens on the street, or he could be shooting at people or he could be shooting at officers. I don't know what's going to happen ***. What I know is it was a homicide offender, that he was reasonably believed to be armed, that as many officers' help in that area and listening to or be aware of the progress of the pursuit is necessary."

She further stated that she was trained to "help out" in this manner.

On redirect examination, when asked whether she thought it was okay to violate general order 97-3 and chase the subject, Officer Lee stated: "I did not chase the suspect." She further denied that she was attempting to catch up to the pursuit. She also stated that when she entered the expressway, the pursuit was a half mile to a mile away and that she was "hoping that she [could be] of assistance."

Plaintiff next called Jason Lococo, an Illinois State Police trooper, who testified that he arrived at the scene of the collision shortly before fire personnel and paramedics arrived. He

10

stated that when he arrived Hudson's vehicle was overturned on the shoulder, but he did not recall the location of Officer Lee's vehicle. After being shown photographs, he stated that Officer Lee's vehicle was facing northeast – in the opposite direction of the flow of traffic. He noted that the majority of the damage to Officer Lee's vehicle was to the left front portion and that there was damage to the left side of Hudson's vehicle.

Officer Lee's partner, Officer Ray, was next to testify. He stated that on May 7, 2001, he and Officer Lee heard a radio dispatch about a white van being pursued on the 290 (Eisenhower) expressway. He acknowledged that they were not directed or instructed by dispatch to participate in the pursuit, but that they took it upon themselves to do so.

Officer Ray stated that as he and Officer Lee entered the westbound expressway, he could see that there were "a number" of police cars chasing the white van. He acknowledged that neither he nor Officer Lee told dispatch that they saw the pursuit or that they were going to participate in it. He said by the time he and Officer Lee entered the expressway, the actual pursuit was several blocks ahead. He said that there was civilian traffic on the road and that they had to maneuver into different lanes as a result of the traffic in front of them. Officer Ray denied that he and Officer Lee were attempting to apprehend the suspect, averring that they were "intending to assist the officers."

Officer Ray stated that he did not see Hudson's vehicle until right before the impact and that he did not recall seeing it move from the right shoulder in front of their vehicle. He said that he and Officer Lee were in lane 2 or 3 before the crash.

On cross-examination, Officer Ray stated that assisting other officers was part of his

duties. He further described that when there is a pursuit of a homicide suspect

"we are able to assist in the pursuit or assist the officers. For instance, say a chase

has ended in the offender stopping the vehicle, jumping out of the car. At that

point, they may need assistance for information from the neighborhood people

explaining where the guy went, and that's where I would come in at. Or they need

assistance in apprehending the offender due to the fact he may be able to run fast

or he's agile, and that's where I would come in at as far as assisting. Or canvassing

the area to apprehend the offender."

He further stated that police officers are not supposed to wait for a supervisor to tell them to assist other officers.

With regard to the minutes preceding the accident, Officer Ray stated that he saw the white van being pursued as he and Officer Lee entered the westbound expressway. He said that Officer Lee did not try to catch up with the pursuit and that she was not traveling at a high rate of speed. He said that they were not in pursuit but that he considered himself an "assistant to the pursuit." He further stated that their vehicle's flashing lights and sirens were on at all times.

On redirect, Officer Ray estimated that Officer Lee was traveling approximately 50 or 55 miles per hour at the time of the accident. He stated that he could not recall whether he or Officer Lee engaged the vehicle's lights, but he knew they were on. However, he later stated that he could not recall if the emergency lights were on.

Lieutenant Carolyn Jackson testified that at the time of the accident she was a field lieutenant and a watch commander. She stated that she was familiar with the police department

general orders regarding pursuits. She stated that officers who are "actively involved in pursuit" are actively trailing a suspect's vehicle. She acknowledged that if Officers Lee and Ray left their positions and entered the expressway with their lights and siren on and the pursuit was directly in front of them and they were trailing it, that would mean they were actively engaged in the pursuit. She said that if Officers Lee and Ray were assisting in apprehending a suspected felon, they were required under department policy and procedure to advise dispatch; however, she stated that it was likely that dispatch had ordered radio silence in order to keep contact with the people who were actually doing the pursuit. Lieutenant Jackson also stated that it is a police officer's duty to assist in the apprehension of a fleeing homicide suspect if in the same geographic area. Finally, Lieutenant Jackson stated that in her review of the incident, she learned that 12 to 15 police vehicles were involved in the pursuit.

The jury was next shown the videotaped deposition of an eyewitness, Denise Patrick, who testified that on May 7, 2001, she was standing outside the 290 Lounge, which is located on the south side of the Eisenhower expressway between Homan and Central Park Avenues. Patrick stated that while she was standing outside, she heard sirens and then saw flashing lights on the expressway. She stated that she could see that the police were involved in a chase but could not see who was being pursued. After seeing this pursuit from her vantage outside the 290 Lounge, Patrick went over to the gate that separated the expressway from the street.

Patrick stated that, from that position, she saw a collision, describing that "one car was trying to get over to the shoulder when a police car come from the far left and all the way up to the right and hit him, like right to *** the back of his car almost." She stated that just the front

13

part of Hudson's car was on the shoulder at the point of the impact. She said that the police car was in the far left of the four lanes when she first saw it and that it was going 55 to 65 miles per hour. She said Hudson's car was going approximately 10 miles per hour. She said that the police car "jumped from the [far] left lane" to the far right lane and stated that she did not know why it did so, because the left lane from which the car "jumped" was not impeded by traffic. She further stated the police car struck the back of Hudson's car as he was "approaching to get off on the shoulder."

On cross-examination, Patrick admitted that prior to witnessing the accident she had consumed about four drinks of alcohol. She further acknowledged that she may have previously stated that the police car she witnessed had its emergency lights on at the time of the accident.

Plaintiff next called Dr. Mariusz Ziejewski as an expert witness. Dr. Ziejweski reported that he has a Ph.D. in mechanical engineering and is a member of the faculty of the college of engineering at North Dakota State University. He stated that he is a member of the Society of Automotive Engineers and has presented several peer-reviewed papers in the area of impact analysis to automotive structures. He explained that "impact analysis" involves the "analysis of how vehicle structure deforms when sudden force is applied, in a car collision or in other event."

Dr. Ziejewski explained that he was hired by plaintiff's counsel to "perform engineering analysis and explain how the accident *** occurred, how the vehicles collided, and what happened dynamically to the vehicles as a result of the collision." He stated that the materials he reviewed in reaching his opinion included the traffic crash report, depositions of the police officers involved, the deposition of Hudson, and multiple photographs.

Dr. Ziejewski explained that from the photographs he observed damage to left front of the police vehicle and damage to the entirety of Hudson's vehicle. He noted that the extensive damage to Hudson's vehicle was attributable to the fact that the vehicle had rolled over and made his analysis as to how the accident occurred much more difficult. However, he was able to observe specific damage to the left front quarterpanel and to the left corner of the bottom corner of the bumper.

Dr. Ziejewski determined that the initial point of impact on the police vehicle was at its left front corner. He further stated that the initial point of impact on Hudson's vehicle was at its rear left quarterpanel. He specifically ruled out the possibility that the initial point of impact on Hudson's vehicle was at its rear bumper, explaining that the nature of the damage, which was an indented, v-shape, would not match the initial point of impact at the left front of the police vehicle, which was essentially a straight edge. Dr. Ziejewski further noted that the police vehicle ended up facing against the direction of traffic.

Dr. Ziejewski opined that right before the initial impact, Hudson's vehicle was basically pointing to the west, with "some angulation," and that Officer Lee's vehicle was pointing in the opposite direction at some angle. He stated that the left front corner of the police vehicle struck the left rear quarterpanel of Hudson's vehicle. Dr. Ziejewski then demonstrated to the court and jury, using model vehicles, how such an impact would occur.

Dr. Ziejewski further explained that he had created a computer simulation of the accident using the "ED-SMAC" computer program. To run the program, he input the characteristics of the two vehicles involved as well as the road characteristics. He explained the simulation as a

15

graphical representation of physics and stated that the computer program solves the engineering equations to show you how the vehicles would move. He distinguished his computer simulation from animation, explaining that the latter involves merely what you can envision, "like cartoons, with no science behind it."

The computer simulation shown to the jury depicts five lanes of traffic, with the rightmost lane representing the shoulder of the expressway. The car representing Officer Lee's vehicle starts the simulation in the leftmost lane, it starts a hard turn to the right and spins nearly 180 degrees before it contacts the vehicle representing Hudson's vehicle in the shoulder lane. The left front of the police vehicle, which is, at this point, facing opposite the direction of traffic, strikes the left rear of Hudson's vehicle, and then a second impact occurs between the left rear of the police vehicle and the left front of the Hudson vehicle.

On cross-examination by the City, Dr. Ziejewski insisted that a vehicle traveling westbound in dry conditions would require more than one lane's width to spin and end up facing in a northeasterly direction. He agreed that to create the computer simulation, he had to input certain data and that to represent the police vehicle he used data pertaining to a Chevrolet Monte Carlo although the vehicle was actually a Chevrolet Caprice.

He further acknowledged that the computer simulation starts with the police vehicle traveling at a 10-degree angle north of due west and that he then had the vehicle make a "very hard right turn," with the steering wheel at 180 degrees, explaining that there had "to be additional dynamic instability factors," and that he "had to have the police car out of control at the beginning of the run. Otherwise, [it] will never turn around that way." He further stated that,

16

after the turn, he input that the brakes were applied with 50% braking power to the front wheels and 100% braking power to the rear wheels. He explained that if the rear wheels are locked, a car will be less stable in a turn, and the rear of the car will be more likely to "come sliding out and not make the turn with the rest of the car."

Dr. Ziejewski admitted that the year and model of Officer Lee's car were listed as having antilock brakes, but he stated that he did not know whether the police department had removed that feature on Officer Lee's car. Dr. Ziejewski further stated that the simulation had Hudson's vehicle going straight before the accident despite the testimony that it was going slightly to the right. He further acknowledged that the simulation had Hudson's vehicle turning to the right after the impact although Hudson could not recall making any such movement.

Dr. Ziejewski acknowledged that there was no record of skid marks in the material he reviewed and that, normally, such evidence would help in determining speed and direction.

The court instructed the jury on willful and wanton conduct as follows: "When I use the expression 'willful and wanton conduct' I mean a course of action which shows an utter indifference to or a conscious disregard for a person's own safety and the safety of others." The court further stated:

"The plaintiff claims that he was injured and sustained damage and that the conduct of the defendant was willful and wanton in one or more of the following respects:

a. Failed to operate the police car at a speed and in a manner compatible with conditions to ensure that control of the police car was maintained at all times,

17

in violation of General Order 97-3;

b. improperly engaged in caravanning when it was not safe to do so, in violation of General Order 97-3;

c. improperly participated in a pursuit when she was not authorized to do so, in violation of General Order 97-3;

d. in violation of General Order 97-3, drove the police car without due regard for the safety of all persons on the highway, including Vernon Hudson;

e. failed to maintain control over the police car;

f. executed a lane change striking Vernon Hudson's motor vehicle; and

g. in violation of General Order 97-3, failed to adhere to basic traffic safety practices by moving into lane No. 1 when it was not safe to do so;

h. in violation of General Order 97-3, used the activity of following as a subterfuge for a vehicle pursuit;

j. failed to abandon the vehicle pursuit when it was the most reasonable course of action, in violation of General Order 97-3."

The jury was given two special interrogatories. The first asked: "Did Officer Lee act willfully and wantonly at or about the time of the occurrence?" The second asked: "Was Officer Lee executing and enforcing the law at or about the time of the occurrence?"

During closing arguments, Hudson's attorney made the following comment regarding the second special interrogatory: "Ladies and gentlemen, if you're for Vernon, you will answer this special interrogatory no." Counsel also argued that the evidence supported the conclusion that

18

Officer Lee was not enforcing the law. Defense counsel objected to the comment regarding how the jury should answer the interrogatory, and the trial court sustained, admonishing the jury to "disregard that argument."

On March 21, 2005, the jury returned a verdict for Hudson on both counts. In addition, the jury answered the first special interrogatory, regarding whether Lee was willful and wanton, in the affirmative, and the second interrogatory, regarding whether Lee was enforcing the law, in the negative. Thereafter, the trial court entered a judgment on the verdict in the amount of $17,682,374.05.

On May 20, 2005, the City brought a posttrial motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. The trial court denied the motion on July 26, 2005, and the City filed a timely notice of appeal on August 24, 2005.

On appeal, the City raises several arguments. The City first contends that it is entitled to judgment as a matter of law because it is immune from liability for negligence under the Tort Immunity Act and because Officer Lee's conduct was not willful and wanton. With regard to the negligence count, the City does not purport to challenge the jury's finding of negligence; rather, the City contends that it was entitled to judgment as a matter of law on the grounds of immunity. Alternatively, the City contends that a new trial is warranted on the negligence count because Hudson's attorney told the jury the effect of answering the special interrogatory which asked whether Officer Lee was enforcing the law. With regard to the willful and wanton count, the City contends it was entitled to judgment as a matter of law because there was insufficient evidence to support the allegation, and because Hudson's expert's testimony and computer simulation in

support of that count were improperly admitted. The City finally contends that, in the alternative, it is entitled to a new trial on the willful and wanton count because the admission of the computer simulation was prejudicial and because the jury instructions on willful and wanton conduct were misleading.

Hudson generally disputes all of the City's contentions and additionally contends that any error regarding willful and wanton count would be rendered moot by virtue of the jury's finding with regard to the negligence count. Hudson further points out that the City has never contended that the jury's answers to the special interrogatories were against the manifest weight of the evidence and it has, therefore, waived any objections to those findings. Finally, with regard to his attorney's comments about the special interrogatory, Hudson contends that the trial court cured any error in that comment by immediately sustaining the City's objection and instructing the jury to disregard the comment.

## II. ANALYSIS

### A. The City's Motion for Judgment Notwithstanding the Verdict on the Negligence Count

We first address the City's contention that it was entitled to judgment notwithstanding the verdict on the negligence count because it was immune under the Tort Immunity Act. A judgment *non obstante veredicto*, or judgment *n.o.v.*, should be entered where all the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand. Pedrick v. Peoria & Eastern R.R. Co., 37 Ill. 2d 494, 504, 229 N.E.2d 504, 510 (1967). We review rulings on judgments *n.o.v. de novo*. Townsend v. University of Chicago Hospitals, 318 Ill. App. 3d 406, 409, 741 N.E.2d

20

1055, 1057 (2000).

The City contends that sections 2-202 and 2-109 of the Tort Immunity Act apply in this case to defeat Hudson's claim of negligence. Section 2-202 states: "A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202 (West 2004). Section 2-109 states: "A local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-109 (West 2004). According to the City, it is immune from liability because Officer Lee was executing or enforcing the law when the accident occurred and she was not acting willfully or wantonly.

Our supreme court has often explained that the Tort Immunity Act "is in derogation of the common law action against local public entities, and must be strictly construed against the public entity involved." Aikens v. Morris, 145 Ill. 2d 273, 278, 583 N.E.2d 487, 490 (1991); Rio v. Edward Hospital, 104 Ill. 2d 354, 362, 472 N.E.2d 421 (1984). The immunity provided by section 2-202 does not extend to all activities of police officers while on duty, but only to acts or omissions while in the actual execution or enforcement of a law. See Arnolt v. City of Highland Park, 52 Ill. 2d 27, 33, 282 N.E.2d 144, 147 (1972); Fitzpatrick v. City of Chicago, 112 Ill. 2d 211, 221, 492 N.E.2d 1292, 1296 (1986); Aikens, 145 Ill. 2d at 278, 583 N.E.2d at 490. The question of whether a police officer is executing and enforcing the law is a factual determination which must be made in light of the circumstances involved in each case. Arnolt, 52 Ill. 2d at 35, 282 N.E.2d at 148-49. However, where the evidence is undisputed or susceptible to only one possible interpretation, the question may be decided as a matter of law. Simpson v. City of

No. 1-05-2822

Chicago, 233 Ill. App. 3d 791, 792, 599 N.E.2d 1043, 1044 (1992); Sanders v. City of Chicago, 306 Ill. App. 3d 356, 361, 714 N.E.2d 547, 551 (1999).

The question as to what activities can be deemed to constitute executing or enforcing the law appears to have been determined on a case-by-case basis. In Fitzpatrick, our supreme court held that investigating a traffic accident constituted an execution or enforcement of the law. Fitzpatrick, 112 Ill. 2d at 221, 492 N.E.2d at 1296. In that case, the plaintiff was in a minor automobile accident with another driver on the Stevenson expressway. Fitzpatrick, 112 Ill. 2d at 215, 492 N.E.2d at 1293. Plaintiff and the other driver pulled their cars onto the median and, shortly thereafter, the police officer defendant pulled his car a few feet behind one of the cars. Fitzpatrick, 112 Ill. 2d at 215, 492 N.E.2d at 1293. While plaintiff and the police officer were examining the damage to one of the cars, a vehicle driven by a third party struck the parked police car, causing it to strike the plaintiff. Fitzpatrick, 112 Ill. 2d at 215, 492 N.E.2d at 1294. In discussing whether the police officer was executing or enforcing the law at the time of plaintiff's injury for purposes of determining whether the defendant's were immunized under section 2-202, our supreme court explained:

" '[e]nforcing the law is rarely a single, discrete act, but is instead a course of conduct.' [Thompson v. City of Chicago, 108 Ill. 2d 429, 433 (1985).] *** Thus, where the evidence establishes that at the time of his alleged negligence a public employee was engaged in a course of conduct designed to carry out or put into effect any law, an affirmative defense based upon section 2-202 and 2-109 of the Tort Immunity Act [citation] should be available to the governmental employee

22

and his employer." Fitzpatrick, 112 Ill. 2d at 221, 492 N.E.2d at 1296. The supreme court then determined that defendants were entitled to a directed verdict because, even when viewing the evidence in a light most favorable to plaintiff, it was clear that the police officer, who had observed and responded to a traffic accident, was in the process of executing or enforcing applicable traffic laws at the time plaintiff's injury occurred. Fitzpatrick, 112 Ill. 2d at 222, 492 N.E.2d at 1297.

Similarly, in Morris v. City of Chicago, 130 Ill. App. 3d 740, 474 N.E.2d 1274 (1985), the court found that an officer who was responding to a radio report of a crime in process was executing or enforcing the law. There, plaintiff brought suit against the city and a police officer for injuries sustained when his parked car was struck by the officer's police car. Morris, 130 Ill. App. 3d at 741, 474 N.E.2d at 1276. The court found that immunity applied because, at the time of the accident, there was an "unbroken effort" on the officer's part to respond to the call and thereby execute and enforce the law. Morris, 130 Ill. App. 3d at 744, 474 N.E.2d at 1278. The court further rejected plaintiff's contention that the officer could not be said to be executing or enforcing the law because he did not actually see a crime being committed. Morris, 130 Ill. App. 3d at 743, 474 N.E.2d at 1277.

In Bruecks v. County of Lake, 276 Ill. App. 3d 567, 658 N.E.2d 538 (1995), plaintiff brought negligence claims against Lake County and a deputy sheriff alleging that while he was crossing a road on foot, he was struck and injured by the deputy's police car. Bruecks, 276 Ill. App. 3d at 568, 658 N.E.2d at 539. Defendants claimed immunity under section 2-202 and 2-109, contending that when the accident occurred, the deputy was responding to a report of shots

fired. Bruecks, 276 Ill. App. 3d at 568, 658 N.E.2d at 539. The trial court granted defendants' motion for summary judgment and plaintiff appealed. Bruecks, 276 Ill. App. 3d at 568, 658 N.E.2d at 539. The appellate court affirmed, finding that the deputy was executing or enforcing the law at the time of the accident and that the defendants were, therefore, immune. Bruecks, 276 Ill. App. 3d at 569, 658 N.E.2d at 540. The court noted:

"[The deputy] was responding to a call of shots fired. He clearly was being called upon to execute or enforce a law. The facts that he was not specifically dispatched to the scene, did not have his emergency lights and siren activated, and did not subjectively consider the situation to be an emergency do not alter this conclusion. The cases in which immunity has been found applicable do not require that the officer be engaged in an emergency response." Bruecks, 276 Ill. App. 3d at 569, 658 N.E.2d at 539.

On the other hand, there is an extensive line of cases that has held that ordinary police activities do not qualify as enforcement or execution of the law so as to be protected by section 2-202 immunity. For example, in Aikens, our supreme court found that the act of transporting prisoners did not constitute an execution or enforcement of the law that would immunize the city of Evanston and one of its police officers from the plaintiff's claims of negligence. Aikens, 145 Ill. 2d at 286, 583 N.E.2d at 494. The court noted that unlike the police officers' conduct in other cases where immunity was found to apply, the police officer's conduct in its case "was not shaped or affected in any manner by the nature of duties in either enforcing or executing law." Aikens, 145 Ill. 2d at 286, 583 N.E.2d at 494. The court explained:

24

"[V]irtually every police function or duty is pursuant to some legal authorization in the broadest sense. [Citation.] Arguably, then the performance of any task while on duty is in enforcement or execution of the law. We do not believe, however, as we have previously stated, that the legislature intended such a result." Aikens, 145 Ill. 2d at 285, 583 N.E.2d at 493.

In Simpson, a police car driven by a Chicago police officer struck and seriously injured a 10-year-old girl riding a bicycle. Simpson, 233 Ill. App. 3d at 792, 599 N.E.2d at 1044. The police officer and the City of Chicago claimed immunity under section 2-202, contending that the police officer was enforcing the law at the time of the accident in that he was on his way to an address where someone had called to report a missing person. Simpson, 233 Ill. App. 3d at 792, 599 N.E.2d at 1044. The trial court granted summary judgment to defendants and the appellate court reversed, noting that the police officer "did not consider the call an emergency and there was no indication that any crime had been committed or that any law required execution or enforcement." Simpson, 233 Ill. App. 3d at 793, 599 N.E.2d at 1044. The court further rejected plaintiff's contention that filling out a missing persons report constituted executing the law, noting that although the police officer's "activities were governed by some legal requirement, [it was] insufficient to raise [those activities] to the level of executing or enforcing the law." Simpson, 233 Ill. App. 3d at 793, 599 N.E.2d at 1045.

In Leaks v. City of Chicago, 238 Ill. App. 3d 12, 606 N.E.2d 156 (1992), a police officer was cruising in a patrol car when he saw several people standing in front of and in the hallway of an apartment building. Leaks, 238 Ill. App. 3d at 14, 606 N.E.2d at 157. The officer testified

25

that he suspected that the people he observed were engaged in illegal drug trade. Leaks, 238 Ill. App. 3d at 14-15, 606 N.E.2d at 157. While reversing his car to further investigate, the officer struck the plaintiff's vehicle and, allegedly, injured the plaintiff. Leaks, 238 Ill. App. 3d at 15, 606 N.E.2d at 158. At trial, the officer and the City raised the affirmative defense of immunity, contending that the officer was enforcing the law at the time of the accident. Leaks, 238 Ill. App. 3d at 14, 606 N.E.2d at 157. On appeal, the court found that the officer was not executing the law, noting that there was

> "absolutely no indication that [the officer] observed the exchange of any money or the transfer of any drugs, or for that matter any crime at all. *** What remains is a record which only shows several people standing in front of and in the hallway of an apartment building on a summer evening, a common occurrence in most every neighborhood." Leaks, 238 Ill. App. 3d at 17, 606 N.E.2d at 159.

Similarly, in Sanders, a Chicago police officer heard an emergency call that another officer had been attacked. Sanders, 306 Ill. App. 3d at 359, 714 N.E.2d at 550. The officer then proceeded to travel to the area in his squad car; however, shortly thereafter, the police dispatcher confirmed over the police radio that the original officers involved did not need further backup. Sanders, 306 Ill. App. 3d at 359, 714 N.E.2d at 550. About one minute after the radio dispatch, the responding police officer's car struck and killed a child crossing the street. Sanders, 306 Ill. App. 3d at 360, 714 N.E.2d at 551. The appellate court found that the officer and the City were not entitled to summary judgment on the basis of section 2-202 immunity, noting that a jury could find that the emergency was over at the time the accident occurred and that the officer "was

26

merely cruising around in his car" – an activity not subject to immunity. Sanders, 306 Ill. App. 3d at 361, 714 N.E.2d at 552.

In this case, it is undisputed that a police pursuit was in progress, that Officer Lee heard about the pursuit over her police radio, and that she and Officer Ray then entered the expressway to take part in some manner. Officers Lee and Ray denied taking part in the actual pursuit in violation of the police department general order which limited pursuits to two police vehicles, but characterized their involvement as "assistance." When asked to explain what she meant by "assistance," Officer Lee testified that it could include something "as little as traffic control," or that she could be needed to assist if the suspect were to "grab a girl on the street or citizens on the street, or he could be shooting at people or he could be shooting at officers." Officer Ray similarly testified that his and Officer Lee's "assistance" could have been needed if the suspect were to leave his vehicle and flee on foot. He stated that in such an event, he and Officer Lee could then assist by gathering "information from the neighborhood people," or by "apprehending the offender due to the fact he may be able to run fast or he's agile," or "canvassing the area to apprehend the offender."

It is clear that had Officer Lee been actually providing traffic control at the time of the accident, section 2-202 immunity would apply. See Fitzpatrick,112 Ill. 2d at 221, 492 N.E.2d at 1296 (investigating traffic accident constituted executing or enforcing the law). There is also little doubt that had Officer Lee merely been on her way to provide traffic control, immunity would apply. See Morris, 130 Ill. App. 3d at 744, 474 N.E.2d at 1277 (immunity applied where officer was on his way to area where a crime was in progress); Bruecks, 276 Ill. App. 3d at 569,

27

658 N.E.2d at 539 (immunity applied where police officer was on his way to area where shots were fired). Likewise, it is clear that had the vehicle pursuit ended and had the lead officers then requested backup due to the suspect taking a hostage or shooting at the police, Officer Lee's travel to that area would be covered by the immunity in section 2-202. See Sanders, 306 Ill. App. 3d at 361, 714 N.E.2d at 552. (responding to a call for assistance from other officers covered by section 2-202 immunity). Finally, there can be no dispute that had Officer Lee been attempting to apprehend the suspect with the permission of her supervisors she would have been immune from negligence under section 2-202.

However, under the evidence presented, the jury was free to conclude that none of these scenarios occurred in this case. Officers Lee and Ray specifically denied that they were trying to apprehend the suspect. Moreover, there was no specific indication in the record that traffic control was actually required or requested or that the officers engaged in the actual pursuit required or requested backup. The only law that was in actual need of enforcement related to the apprehension of the criminal suspect, and Officer Lee explicitly denied that she was taking part in that enforcement. Thus, the jury could have concluded that Officer Lee was not involved in enforcing or executing the law, but was merely making herself available to enforce or execute the law should the need arise.[4] The mere fact that a police officer acts on the speculation that she

[4]The jury was also free to reject Officer Lee's contention that she was not in pursuit of the suspect in violation of the police department general order based upon the evidence that she was closely monitoring the radio dispatch and was changing lanes to correspond with the suspect's movement. While the parties cite no authority discussing whether a police officer can be deemed

28

may be required to enforce or execute some, as yet, undetermined law is not enough to activate the immunity set forth in section 2-202. Thus, there was no immunity from negligence in <u>Leaks,</u> where the officer merely had a suspicion that drug laws required enforcement because there was no specific indication that any law was actually being broken. <u>Leaks</u>, 238 Ill. App. 3d at 17, 606 N.E.2d at 159. Similarly, here, Officer Lee's explanation for her actions amounted merely to suspicion that an undetermined law might need enforcing. Moreover, the situation here is even more removed from the actual enforcement or execution of law because, unlike in <u>Leaks,</u> where the officer suspected that drug laws were being broken, the hypothetical situations described by Officer Lee that might have required her to enforce the law were far less focused in that they spanned from traffic control to dealing with a gunman with a hostage.

Furthermore, that Officer Lee was not enforcing or executing any law is additionally supported by the fact that she was aware of the departmental rules prohibiting her from joining the pursuit, caravanning with the pursuing officers, or from following as a subterfuge for pursuit. Moreover, the evidence showed that 12 to 15 other police vehicles were already involved in the

---

to be enforcing the law when she is pursuing a suspect in direct derogation of an internal police department rule, it would arguably be inconsistent to extend the immunity provided in section 2-202 under such circumstances. In that regard, we note that Officer Lee's alleged violation of the general order was not merely one of failing to adhere to specific requirements for pursuit, such as that emergency lights and sirens must be used; rather, had she joined the pursuit, she would have been acting contrary to a rule directly forbidding such action and she would then, arguably, lack the authority or capacity to enforce the law.

pursuit. Thus, despite her explanations to the contrary, the jury may have found that Officer Lee was not on the expressway to enforce the law, but was merely following the pursuit out of personal interest in the outcome or some unofficial camaraderie with her fellow officers who were leading the pursuit. Therefore, viewing the evidence in a light most favorable to Hudson, we cannot say that the jury erred in determining that Officer Lee was not enforcing or executing the law at the time of the collision. Pedrick, 37 Ill. 2d at 504, 229 N.E.2d at 510. Accordingly, we must affirm the trial court's refusal to grant the City judgment *n.o.v.* on the negligence count.

B. The City's Motion for a New Trial on the Negligence Count

The City, however, alternatively contends that it is entitled to a new trial on the negligence count because plaintiff's attorney told the jury how to answer one of the special interrogatories. During closing arguments plaintiff's, counsel stated:

"The judge wants to have you answer the following question: Was Officer Lee executing and enforcing the laws at the time of the occurrence?

That's what we went over earlier when we were talking about their affirmative defense where they're trying to claim this was an emergency.

Ladies and gentlemen, I respectfully submit to you that the answer to this question is no, Officer Lee was not enforcing the law at or about the time of the occurrence.

Ladies and gentlemen, if you're for Vernon, you will answer this special interrogatory no.

***

30

The evidence is overwhelming that the City has not met their burden of proof. And that's what it is. We each have burdens of proof in this case. The City has to establish their burden of proof that Officer Lee, that there was that probability that we talked about of there being an apprehension.

The City has their burden of proof. It's not our responsibility to rebut it. We spent a lot of time on it and I think the evidence is overwhelming that we have rebutted it. The City has not met their burden of proof and, based on that failure, we ask you to check off no, Officer Lee was not executing or enforcing the law."

The City claims that it is entitled to a new trial based upon the excerpt of this closing argument where counsel said: "[I]f you're for Vernon, you will answer this special interrogatory no."

Generally, we will not reverse a trial court's refusal to grant a new trial unless the court abused its discretion. Maple v. Gustafson, 151 Ill. 2d 445, 455, 603 N.E.2d 515 (1992). Similarly, "[t]he scope of closing argument is within the sound discretion of the trial court and the reviewing court will reverse only if the argument is prejudicial." Eaglin v. Cook County Hospital, 227 Ill. App. 3d 724, 732-33, 592 N.E.2d 205, 211 (1992).

This issue was addressed by our supreme court in Sommese v. Mailing Brothers, Inc., 36 Ill. 2d 263, 222 N.E.2d 263 (1966). In that case, plaintiff's counsel told the jury that a special interrogatory had been "slipped in" by defendant's counsel and that the jury should harmonize its answer to the interrogatory with the verdict so as not " 'to deprive this woman of any right to recovery.' " Sommese, 36 Ill. 2d at 266, 222 N.E.2d at 470. Although defendant made no objection to the statement until it brought a posttrial motion, the supreme court held that the

31

argument improperly informed the jury of the source of the interrogatory and defeated the purpose of a special interrogatory by advising the jury to conform its answer to its verdict so as to protect the verdict without regard to the evidence. Sommese, 36 Ill. 2d at 266-67, 222 N.E.2d at 470. The court explained:

"It is generally recognized that the function of a special interrogatory is to require the jury's determination as to one or more specific issues of ultimate fact and is a check upon the deliberations of the jury. 'Special interrogatories are used for the purpose of testing the general verdict against the jury's conclusions as to the ultimate controlling facts.' [Citation.]" Sommese, 36 Ill. 2d at 267, 222 N.E.2d at 470.

The court further stated:

"It is clear that plaintiff's attorney improperly alerted the jury to the fact that its decision to assess damages would be nullified by an affirmative answer to the interrogatory. Thus, the safeguard against a jury awarding damages out of passion or prejudice or sympathy without first making specific factual determinations and then applying the law thereto was thwarted." Sommese, 36 Ill. 2d at 267-68, 222 N.E.2d at 470.

The court then concluded that the error was prejudicial and mandated a new trial. Sommese, 36 Ill. 2d at 268, 222 N.E.2d at 470.

The supreme court again addressed this issue in Batteast v. Wyeth Laboratories Inc., 137 Ill. 2d 175, 560 N.E.2d 315 (1990). In that case, plaintiff's counsel told the jury on two occasions

32

that if it "wanted to award the plaintiffs damages from the defendant drug company, its answer to the interrogatory would have to be that the hospital was not the sole cause of the injuries." Batteast, 137 Ill. 2d at 185-86, 560 N.E.2d at 320-21. The trial court denied defense counsel's objection to the statements and did not issue a cautionary instruction. The supreme court noted that it is improper to inform a jury of the necessity of conforming its answer to a special interrogatory with its general verdict, but that it is proper to urge a jury to answer a special interrogatory in accordance with the evidence. Batteast, 137 Ill. 2d at 186, 560 N.E.2d at 321. The supreme court then determined that although counsel did not expressly state that the jury's answer to the special interrogatory had to be consistent with the verdict, neither did he argue that the jury should base its answer on the evidence. Batteast, 137 Ill. 2d at 186, 560 N.E.2d at 321. Rather, the court noted, counsel's argument was that the jury had to answer the special interrogatory in a certain way if the jury wanted to make an award in favor of the plaintiff. Batteast, 137 Ill. 2d at 186, 560 N.E.2d at 321. The court determined the argument to be improper; however, it nevertheless avoided making a final determination based on that language since it found that a new trial was warranted for other reasons. Batteast, 137 Ill. 2d at 186, 560 N.E.2d at 321. Moreover, although the court deemed the statement in its case improper, it upheld the appellate decision in Levin v. Welsh Brothers Motor Service, Inc., 164 Ill. App. 3d 640, 518 N.E.2d 205 (1987), where a similar statement was deemed to be permissible. Batteast, 137 Ill. 2d at 186, 560 N.E.2d at 321.

In Levin, plaintiff's counsel advised the jury that if it answered "yes" to a special interrogatory which asked whether plaintiff's negligence was the sole proximate cause of his

33

injuries, there could be no verdict for plaintiff. Levin, 164 Ill. App. 3d at 651, 518 N.E.2d at 212. The plaintiff's counsel argued that had he not been interrupted by defendant's objection to his statement, he would have explained to the jury that the reason there could not be a verdict for the plaintiff if they answered "yes" was that, if plaintiff's negligence were the sole proximate cause of his injury, that would mean the plaintiff had failed to prove his case and could not recover. Levin, 164 Ill. App. 3d at 651, 518 N.E.2d at 212. The appellate court noted that, unlike in Sommese, plaintiff's counsel did not state the source of the special interrogatory, he did not state that the answer thereto would supersede the verdict, and he did not bid the jury to harmonize its verdict with its answer to the interrogatory. Levin, 164 Ill. App. 3d at 652, 518 N.E.2d at 213. The court further noted that although counsel's statement could be construed as advising the jury of the "legal effect" of its answer, it was equally plausible that counsel was "merely advising the jury of the answer's logical 'effect' – namely, that in contrast to a situation of comparative negligence, if the sole negligence were Levin's then Levin could not recover against anyone else." Levin, 164 Ill. App. 3d at 652, 518 N.E.2d at 213. The court then held that "[i]n view of the ambiguity and brevity" of the statement, "as well as the *** cautionary instruction by the trial judge," the trial court did not commit reversible error in denying a mistrial. Levin, 164 Ill. App. 3d at 652, 518 N.E.2d at 213.

The supreme court in Batteast distinguished its facts from those in Levin by noting that, unlike in that case, the improper statement was made twice, the trial court denied defendant's objection to plaintiff's statement regarding the special interrogatory, no cautionary instruction was given, and the statement was not ambiguous. Batteast, 137 Ill. 2d at 186, 560 N.E.2d at 321.

34

We find the instant facts to be more similar to those in <u>Levin</u> than those in <u>Batteast</u>.

In this case, as in <u>Levin</u>, plaintiff's counsel did not solicit the jury to harmonize its answer to be consistent with the verdict (as was the case in <u>Sommese</u>), nor did he delineate or emphasize the need to answer the special interrogatory with a "no" if the jury wanted to award plaintiff damages. Although counsel briefly stated "if you're for Vernon, you will answer *** no," when taken in full context, as set forth above, the thrust of counsel's argument centered upon the weight of the evidence favoring that answer wherein counsel emphasized to the jury that based upon the evidence presented and in the light of the City's burden of proof, an answer of "no" was required. As noted, just prior to and following the objected to statement, Hudson's attorney emphasized that the evidence supported the conclusion that Officer Lee was not enforcing the law. He also emphasized that it was the City's burden to prove its affirmative defense that Officer Lee was enforcing the law and, therefore, immune. Such comment on a special interrogatory is permissible.

This result was recognized in <u>O'Connell v. City of Chicago</u>, 285 Ill. App. 3d 459, 674 N.E.2d 105 (1996), where the court explained:

> "The decisions describe the two sides of the line that has been drawn: plaintiff's lawyer may ask the jury for a certain answer to the interrogatory, based on the evidence, and that jury may be told a contrary answer will mean no recovery for the plaintiff. But the line is crossed when jurors are told to harmonize or conform their interrogatory answer with their general verdict, or, as was done in this case, when jurors are told inconsistency would mean the plaintiff's case is

not proved. That is impermissible linkage." O'Connell, 285 Ill. App. 3d at 467, 674 N.E.2d at 111.

Accord Kosinski v. Inland Steel Co., 192 Ill. App. 3d 1017, 1028, 549 N.E.2d 784, 790-91 (1989) (new trial not required where counsel stated: " 'If you listen to what negligence is and what he was doing, *** if you answer that interrogatory any way other than no, then you are saying the accident is [plaintiff's] fault and he can't recover,' " because statement properly asked jury to answer the interrogatory based on the evidence and did not tell jury its award of damages would be nullified by a "yes" answer to the interrogatory); Burns v. Howell Tractor & Equipment Co., 45 Ill. App. 3d 838, 848, 360 N.E.2d 377, 385 (1977) (new trial not required where counsel stated: " 'if you answer that Interrogatory any way than "no," then you are saying, "It is his fault and he can't recover" ' "); Moore v. Checker Taxi Co., 133 Ill. App. 2d 588, 273 N.E.2d 514 (1971) (new trial not required where counsel stated: "If you believe he was not guilty of negligence that caused this accident, you should answer no to [the interrogatory], because if [plaintiff] was guilty of negligence, then he can't recover ***"). Accordingly, we cannot find that the trial court abused its discretion in denying the City's motion for a new trial on this basis.

C. The City's Motion for Judgment Notwithstanding the Verdict on the Willful and Wanton Count

The City next contends that the evidence adduced at trial was insufficient for the jury to reach a finding of willful and wanton conduct, noting that the only evidence regarding Officer Lee's conduct prior to the accident consisted of the testimonies of Officers Lee and Ray, the testimony of the witness Patrick, and the testimony and computer simulation of plaintiff's expert,

Dr. Ziejewski. The City contends that the trial testimony did not support a finding of willful and wanton conduct and that the computer simulation was improperly admitted. Therefore, the City argues that, as with the negligence count, it was entitled to judgment *n.o.v.*

We note that the jury's award to Hudson, which did not include punitive damages, can be sustained by our affirmance of the negligence count alone. See Moore v. Jewel Tea Co., 46 Ill. 2d 288, 294, 263 N.E.2d 103, 106 (1970) ("It is settled law that where several causes of actions are charged and a general verdict results, the verdict will be sustained if there are one or more good causes of action or counts to support it"). Nevertheless, for the reasons discussed below, we additionally find that the jury was also free to side with Hudson on the willful and wanton count.

Section 1-210 of the Tort Immunity Act defines willful and wanton conduct as: "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-201 (West 2004). Our supreme court has recently recounted that willful and wanton conduct " ' "approaches the degree of moral blame attached to intentional harm, since the defendant deliberately inflicts a highly unreasonable risk of harm upon others in conscious disregard of it." ' [Citation.]" Murray v. Chicago Youth Center, 224 Ill. 2d 213, 237, 864 N.E.2d 176, 190 (2007), quoting Burke v. 12 Rothschild's Liquor Mart, Inc., 148 Ill. 2d 429, 448, 593 N.E.2d 522 (1992). The court further noted that willful and wanton conduct is " 'quasi-intentional' " and is qualitatively different from negligence. Murray, 224 Ill. 2d at 237, 864 N.E.2d at 190, quoting Burke, 148 Ill. 2d at 450, 593 N.E.2d 522. The question of whether an

injury has been inflicted by willful and wanton conduct is a question of fact to be determined by a jury. Murray, 224 Ill. 2d at 236, 864 N.E.2d at 189.

The City argues that Dr. Ziejewski's testimony and computer simulation were improper and that, in the absence of that evidence, there was insufficient other evidence remaining to support the jury's finding of willful and wanton conduct. As shall be discussed below, we do not consider Dr. Ziejewski's testimony and computer simulation improper; however, we also disagree with the City's conclusion that, in the absence of that evidence, the jury could not have found Officer Lee's conduct willful and wanton. As noted, Officer Lee testified that she was driving within the speed limit at 45 to 50 miles per hour, that her emergency lights were activated, and that she had changed lanes from lane 2 to lane 1 when Hudson's car pulled out in front of her from the shoulder. She stated that she applied the brakes once she saw Hudson's car and that she then lost control. She also stated: "I was not necessarily looking if someone will merge into my lane from the shoulder. *** I wasn't looking at the lane that I was going in, I was looking at the car in front of me." Officer Ray's testimony was similar Officer Lee's in many respects; however, he expressed some uncertainty as to whether the vehicle's emergency lights were activated and he also said that the police vehicle was in lane 2 *or* 3 before the collision. Patrick testified that Officer Lee's vehicle was traveling at 55 to 65 miles per hour, that Hudson's vehicle was traveling at 10 miles per hour and that just the front of Hudson's vehicle was on the shoulder at the time of the accident. She further stated that Officer Lee's vehicle "jumped from the left lane" all the way to the right even though there was nothing obstructing Officer Lee's forward progress.

Thus, considering solely this evidence (to the exclusion of Dr. Ziejewski's testimony and

simulation, which the City objects to), the jury was free to disbelieve the City's position that Hudson pulled out in front of Officer Lee's vehicle while she was turning into lane 1 from lane 2. Likewise, the jury was free to give great weight to Officer Lee's admission that she was not "looking at the lane that [she] was going in," as well as to Patrick's description that Officer Lee's vehicle "jumped" from lane 4 to lane 1 for no apparent reason. Although these testimonies are not the strongest conceivable evidence of willful and wanton conduct, viewing the evidence in a light most favorable to Hudson, we cannot conclude that the jury in this case was unreasonable in reaching such a conclusion. See Pedrick, 37 Ill. 2d at 504, 229 N.E.2d at 510. The jury may well have concluded that in failing to look at the lane she was merging into and in "jumping" multiple lanes of traffic, Officer Lee was acting with utter indifference to or in conscious disregard for the safety of others. Although, there was testimony that there was nothing obstructing Officer Lee from continuing forward in her lane, she testified that there were multiple civilian cars present with her on the expressway. Thus, the jury may have concluded that Officer Lee's actions in crossing multiple lanes of traffic at once under such conditions without looking at the lane she was traveling into was a deliberate infliction of an unreasonable risk of harm upon those civilians, including Hudson. See Murray, 224 Ill. 2d at 237, 864 N.E.2d at 190. This conclusion is sustainable even in the absence of Dr. Ziejewski's testimony and computer simulation, to which the City has objected. Accordingly, we affirm the trial court's denial of the City's motion for judgment *n.o.v.* on this count.

D. The City's Motion for a New Trial on the Willful and Wanton Count

1. *Expert Testimony and Computer Simulation*

However, the City also contends that it is entitled to a new trial on the willful and wanton count because Dr. Ziejewski's testimony and computer simulation were prejudicial.[5] The City argues that the computer simulation lacked a sufficient factual basis, pointing out that Dr. Ziejewski input several variables into the computer program he used to create the simulation that were not supported by any evidence, namely that Dr. Ziejewski used the wrong make and model of vehicle to represent Officer Lee's vehicle; that the simulation starts with Hudson's vehicle going straight despite testimony that it was moving to the right; that Officer Lee's vehicle starts at 10 degrees off due west despite there being no testimony to that effect; that Officer Lee's vehicle spins nearly 180 degrees before the impact despite there being no testimony to that effect, that Officer Lee's brakes were applied in a certain manner (50 percent to the front and 100 percent to the rear) despite there being no supporting testimony or physical evidence regarding the vehicle's braking system; and that Hudson steered his car to the right after the impact. In this regard, the City contends that Dr. Ziejewski's computer simulation was not sufficiently based on data from the record and was, therefore, prejudicial. We disagree.

Generally, the opinion testimony of an expert is admissible if the expert is qualified by knowledge, skill, experience, training, or education in a field that has at least a modicum of reliability, and if the testimony would aid the jury in understanding the evidence. Wiegman v.

---

[5]The City's challenge to Dr. Ziejewski's testimony and computer simulation appears to be primarily directed to the willful and wanton count since the City does not purport to challenge the jury's finding of negligence under count I except with respect to the application of section 2-202 immunity.

Hitch-Inn Post of Libertyville, Inc., 308 Ill. App. 3d 789, 799, 721 N.E2d 614, 623 (1999). The admission of an expert's testimony lies within the sound discretion of the trial court. Wiegman, 308 Ill. App. 3d at 799, 721 N.E2d at 623. We will not reverse an erroneous ruling unless the error was prejudicial or the result of the trial has been materially affected. Stricklin v. Chapman, 197 Ill. App. 3d 385, 388, 554 N.E.2d 658, 660 (1990).

An expert's opinion is only as valid as the reasons for the opinion. Soto v. Gaytan, 313 Ill. App. 3d 137, 146, 728 N.E.2d 1126, 1132-33 (2000). Reconstruction testimony is testimony that seeks to recreate an accident, including "who hit whom, where was the impact and how fast the parties were going as determined by skid marks, debris, and damage to the vehicles." Finfrock v. Eaton Asphalt Co., 41 Ill. App. 3d 1020, 1023, 355 N.E.2d 214 (1976); Stricklin, 197 Ill. App. 3d at 389, 554 N.E.2d at 660-61. In order for reconstruction testimony to be admissible, there must be sufficient data about the accident in evidence to provide a reasonable basis for the expert's opinion. J. Corkery, Illinois Civil & Criminal Evidence §702.111, at 408 (2000). "The trial court is not required to blindly accept the expert's assertion that his testimony has an adequate foundation. Rather, the trial court must look behind the expert's conclusion and analyze the adequacy of the foundation." Soto, 313 Ill. App. 3d at 146, 728 N.E.2d at 133. See also Dyback v. Weber, 114 Ill. 2d 232, 244, 500 N.E.2d 8 (1986) ("An expert witness' opinion cannot be based on mere conjecture and guess"); Modelski v. Navistar International Transportation Corp., 302 Ill. App. 3d 879, 886, 707 N.E.2d 239 (1999) (expert's opinions based on guess, speculation, or conjecture as to what the witness believed might have happened are inadmissible).

In support of its position, the City cites Hiscott v. Peters, 324 Ill. App. 3d 114, 754

N.E.2d 839 (2001). However, we find that case inapposite. In Hiscott, plaintiff brought suit against defendants for injuries sustained in an automobile accident. Hiscott, 324 Ill. App. 3d at 117, 754 N.E.2d at 842. At trial, plaintiff called Seyfried, a traffic accident reconstructionist, as an expert witness. Hiscott, 324 Ill. App. 3d at 118, 754 N.E.2d at 844. Seyfried testified that he had reviewed the accident report, which included a number of measurements of skid marks and a gouge mark in the pavement at the scene of the accident. Hiscott, 324 Ill. App. 3d at 118, 754 N.E.2d at 844. He also reviewed photographs of the accident scene, the vehicles, and several depositions. Hiscott, 324 Ill. App. 3d at 118, 754 N.E.2d at 844. Based on these observations, he testified to the movement of the vehicles involved in the accident, including that defendant "was faced with an emergency situation and that his vehicle likely went into a 'yaw' once it left the gravel shoulder and returned to the pavement." Hiscott, 324 Ill. App. 3d at 122, 754 N.E.2d at 847. Defendant argued that it was error to permit Seyfried to testify as to the path his vehicle took when there was no physical evidence to support the opinion. Hiscott, 324 Ill. App. 3d at 122, 754 N.E.2d at 847. The appellate court agreed, noting that contrary to the expert's opinion, there was no evidence that defendant's vehicle was " 'yawing' " or that defendant was braking at the time of the accident. Hiscott, 324 Ill. App. 3d at 122, 754 N.E.2d at 847. The court further noted: "There was simply no *** factual basis to support Seyfried's opinion because there was insufficient physical evidence to provide him with the basic data needed to reconstruct the accident." Hiscott, 324 Ill. App. 3d at 124, 754 N.E.2d at 848. The court concluded that because Seyfried's testimony related directly to the central controversies in the case, namely, how the accident took place, that testimony could not be said to have had no effect on the outcome of

the trial and that it may have "tipped the scales" for the jury. Hiscott, 324 Ill. App. 3d at 124, 754 N.E.2d at 848.

In contrast, there was sufficient factual basis in this case for Dr. Ziejewski to reach his conclusions. Although he used data from a Monte Carlo rather than a Caprice in his simulation, he explained that he adjusted the characteristics of the car within the computer program to conform with the characteristics of the police car. His conclusion that Officer Lee's vehicle traversed four lanes of traffic before striking Hudson's vehicle is support by Patrick's testimony that Hudson's vehicle was "trying to get over to the shoulder when [Officer Lee's vehicle] come from the far left and all the way up to the right and hit him, like right to *** the back of his car almost." Moreover, Dr. Ziejewski's assertion that Officer Lee made a hard right turn prior to the collision is supported by Patrick's testimony that vehicle "jumped" across the lanes. Although there was no direct testimony that Officer Lee's vehicle had spun nearly 180 degrees before the collision, that conclusion is supported by the undisputed evidence that the police vehicle, which was originally heading in the same westward direction as plaintiff's vehicle, came to rest facing in nearly the opposite direction. Finally, although there was no testimony to support Dr. Ziejewski's assertion regarding the application and locking of Officer Lee's brakes, that hypothesis was supported by the evidence that Officer Lee's vehicle traveled across multiple lanes and spun nearly 180 degrees.

Arguably, however, even if we were to agree with the City that the computer simulation was insufficiently founded, the jury could have reached its finding of willful and wanton even without Dr. Ziejewski's computer simulation. Essentially, the computer simulation added

emphasis to the conclusion warranted by the testimonial evidence that Officer Lee lost control of the vehicle and had begun to spin prior to hitting Hudson. As noted, Officer's Lee and Ray testified that their vehicle started in lane 2 or 3 and ended up facing opposite the direction of traffic – creating a sufficient basis for inference as to how their vehicle came to reach its final position. Moreover, although Patrick did not articulate in her testimony that Officer Lee's vehicle spun nearly 180 degrees before the collision, her testimony that the vehicle "jumped" across the lanes, and that it came "from the far left and all the way up to the right," is certainly consistent with and helpful to corroborate that conclusion. In sum, we cannot say that the admission of Dr. Ziejewski's testimony and computer simulation was erroneous or, in any event, that it would necessitate a new trial.

### 2. *Willful and Wanton Issue Instruction*

The City finally contends that it is entitled to a new trial because the jury was improperly instructed that willful and wanton conduct could include conduct akin to ordinary negligence and that violation of police department rules should be deemed willful and wanton. As noted, the jury was instructed that willful and wanton conduct involves "a course of action which shows an utter indifference to or a conscious disregard for a person's own safety and the safety of others." This definition is essentially the same as the pattern jury instruction for willful and wanton conduct (see Illinois Pattern Jury Instructions, Civil, No. 14.01 (2000) (hereinafter IPI Civil (2000)) and is not objected to by the City. Rather, the City objects to the trial court's subsequently given issues instruction regarding Hudson's claims on the willful and wanton count. The City first contends that subparagraphs d, e, and f failed to take into account the state of mind required for

44

willful and wanton conduct and implied that the jury could find willful and wanton conduct for acts that would normally only amount to negligence. Therefore, the City concludes that it was error to include these allegations in the issue instruction. We disagree.

The decision to grant or deny a jury instruction is within the trial court's discretion. Sanders, 306 Ill. App. 3d at 364, 714 N.E.2d at 554. The standard for determining whether the trial court abused its discretion is whether, taken as a whole, the instructions fully, fairly and comprehensively informed the jury of the relevant legal principles. Sanders, 306 Ill. App. 3d at 364, 714 N.E.2d at 554. As a general rule, a judgment will not be reversed where the jury instructions are faulty unless they mislead the jury and the complaining party suffered prejudice. Dabros v. Wang, 243 Ill. App. 3d 259, 269, 611 N.E.2d 1113, 1120 (1993).

The issue instruction given in this case was based on IPI Civil (2000) No. 20.01 [12], which states:

"The plaintiff further claims that he was injured and sustained damage and that the conduct of the defendant was willful and wanton in one or more of the following respects:

[*Set forth in simple form without undue emphasis or repetition those allegations of the complaint as to willful and wanton conduct which have not been withdrawn or ruled out by the court and are supported by the evidence.*]"

(Bracketed material original).

The instruction actually given in this case conforms with the pattern instruction. It included the same first sentence as the pattern instruction and then, as directed, it set forth the

allegations of Hudson's complaint as to willful and wanton conduct. The first sentence of the instruction itself made clear that the jury had to determine whether any of the enumerated allegations were true *and* whether they amounted to willful and wanton conduct. As noted, the jury was given the correct definition of willful and wanton. Moreover, a subsequently given burden of proof instruction further clarified that the jury had to determine whether the allegations in the issue instruction amounted to willful and wanton conduct. That instruction explained that it was Hudson's burden to prove "the defendant acted or failed to act in one of the ways claimed by the plaintiff as stated to you in these instructions *and* that in so acting, or failing to act, the defendant was willful and wanton." (Emphasis added.) IPI CIVIL (2000) No. B21.02.02.

In addition, the City's objection to the format of this issue instruction is contradicted by its own alternate submission. The very same deficiency it now contends is present in the given instruction, namely, that the allegations failed to take proper account of the state of mind involved in willful and wanton conduct, was present in the alternate instruction the City proffered at the instructions conference. In fact, in its alternate instruction, the City submitted an instruction identical to plaintiff's subparagraph f in the very same format.

The City's argument with regard to subparagraph d is slightly more compelling. As noted, that allegation stated Officer Lee "drove the police car without *due regard* for the safety of all persons on the highway" (emphasis added). The City contends that failing to use "due regard" is synonymous with negligence and the instruction, therefore, confused the jury as to the definition of willful and wanton. In support, the City cites <u>Sanders</u>, where the court noted that section 11-205(e) of the Illinois Vehicle Code (625 ILCS 5/11-205(e) (West 2004)), which uses the phrase

46

"due regard," imposed a duty to refrain from negligence. Sanders, 306 Ill. App. 3d at 362, 714 N.E.2d at 552. While we agree with the City that use of the term "due regard" in a willful and wanton issue instruction is questionable even where it so appears in the pleading, we do not believe the use of the phrase in this case was misleading or prejudicial. See Dabros, 243 Ill. App. 3d at 269, 611 N.E.2d at 1120.

The term "due regard" was never mentioned in the negligence jury instructions and was only referenced by plaintiff's attorney during closing arguments where he defined the term as referring to reckless behavior. While discussing the various allegations in the willful and wanton count, Hudson's attorney stated that subparagraph d alleged that Officer Lee "was in violation of the general order, [in that she] drove the police car without due regard for the safety of all the persons on the highway, including Vernon Hudson." He then explained: "[T]hat means, like we heard in the general order, we can't drive reckless. That's what reckless means, you can't be heedless; you can't be unaware of what's going on and go ahead anyway." Thus, despite the connection made between "due regard" and the negligence standard of ordinary care in various sources outside the scope of this trial, the jury in this case was presented with an explanation of the allegation consistent with the willful and wanton definition. As Hudson's attorney explained, failure to use due regard meant being reckless or being unaware of what's going on, but going anyway. This is consistent with the definition of willful and wanton conduct, which includes having conscious disregard for the safety of others. Thus, we cannot conclude that the jury in this case was misled by the use of the phrase "due regard" or that the City was thereby prejudiced.

The City further contends that the willful and wanton issue instruction was erroneous in

47

that it suggested in seven of the nine allegations that violation of the police department general order constituted willful and wanton conduct *per se.* We agree that countermanding a police department general order does not constitute negligence or willful and wanton conduct *per se.* This has been established in Morton v. City of Chicago, 286 Ill. App. 3d 444, 454, 676 N.E.2d 985, 992 (1997). However, Morton implicitly indicates that a violation of an internal police department rule can constitute some evidence of willful and wanton conduct. The court in that case stressed that violation of a police department general order would not "in and of itself" constitute willful and wanton conduct, that the jury could have found that there was a valid reason for the officer in that case to not following the general order, and that "the violation of self-imposed rules or internal guidelines *** does not *** alone constitute evidence of negligence, or beyond that, wilful and wanton conduct. [Citation.]" Morton, 286 Ill. App. 3d at 454, 676 N.E.2d at 992. Thus, Morton impliedly stands for the proposition that, although a violation of an internal rule will not automatically constitute willful and wanton conduct, a jury may considere it along with other evidence in reaching a determination of willful and wanton conduct. Therefore, the jury here could have found that Officer Lee's failure to abide the general order by caravanning or pursuing the suspect or failing to adhere to basic traffic safety practices was willful and wanton under the particular circumstances of this case.

Moreover, we cannot agree that this instruction was confusing or prejudicial when considered in light of the jury instructions as a whole. See Harden v. Playboy Enterprises, Inc., 261 Ill. App. 3d 443, 453, 633 N.E.2d 764, 771 (1993) ("Jury instructions are to be viewed as a whole and reversible error occurs only when serious prejudice to a right to a fair trial has been

48

proven"). As noted above, the jury was correctly instructed as to the definition of willful and wanton conduct, as well as to Hudson's burden of proof with regard to the allegations in the issue instruction. Thus, it was clear that in order to find for plaintiff, the jury not only had to believe one or more of the allegations in the willful and wanton issue instruction, but it also had to determine that the conduct alleged qualified as willful and wanton. Therefore, we reject the City's contention that the willful and wanton issue instruction misled the jury into thinking that violation of the police department general order constituted willful and wanton conduct *per se.*

Moreover, we note that the City may well have failed to preserve any objection it would have to the given jury instructions by not tendering a correct alternate instruction in the court below. See Deal v. Byford, 127 Ill. 2d 192, 202-03, 537 N.E.2d 267, 271 (1989) ("To preserve an objection to a jury instruction a party must both specify the defect claimed and tender a correct instruction"). After objecting to the instruction tendered by plaintiff, the City proffered the following instruction as an alternate:

"The plaintiff claims that he was injured and sustained damage and that the conduct of the defendant was willful and wanton in one or more of the following respects:

a. Failed to operate the motor vehicle at a speed and in a manner compatible with conditions to ensure that control of the motor vehicle is maintained at all times;

b. Executed a lane change striking Vernon Hudson's motor vehicle."

Along with reference to the police department general order, this instruction omitted

plaintiff's allegations that Officer Lee was willful and wanton for caravanning, for participating in the pursuit, for failing to maintain control over her car, for moving into lane 1 when it was not safe to do so, for following as a subterfuge for pursuit, and for failing to abandon the pursuit. This conduct was placed in issue and could have constituted willful and wanton conduct if perpetrated with utter indifference to or a conscious disregard for the safety of others. As noted, the pattern jury instruction requires that the allegations of the complaint be set forth unless they have been withdrawn, ruled out by the court, or are not supported by the evidence. IPI Civil (2000) No. 20.01.01. The City has not contended, nor can it, that any of the allegations of the issue instruction were excluded or ruled out by the court. Nevertheless, the City omitted those alleged acts from its proffered instruction and thereby failed to provide a sufficient alternate instruction to preserve its objection. See Deal, 127 Ill. 2d at 202-03, 537 N.E.2d at 271.

In looking at the dissent, we respectfully suggest that in its impassioned eloquence, it has failed to accept the function of a reviewing court, which, upon review of a motion for judgment *n.o.v.*, is to view the evidence in its aspect most favorable to the opponent to determine whether that evidence so overwhelmingly favors the movant that the verdict could never stand. See Townsend, 318 Ill. App. 3d at 409, 741 N.E.2d at 1057. In fact, in ruling on a motion for a judgment *n.o.v.*, "a court does not weigh the evidence *** [but] may only consider the evidence, and any inferences therefrom, in the light most favorable to the party resisting the motion." Maple, 151 Ill. 2d at 453, 603 N.E.2d at 512 (1992). Here, the dissent instead appears to focus upon evidence supporting the City without paying due credence to countervailing evidence and inference which would support this jury's findings that, at the time of the occurrence, Officer Lee

was not executing or enforcing the law for purposes of section 2-202 immunity and, even more strikingly, that her conduct was wilful and wanton.

As discussed above, when the evidence is viewed in a light most favorable to Hudson, the jury's conclusion that the City was not immune from liability for Officer Lee's negligence is sufficient to sustain the verdict. Officer Lee specifically denied that she was attempting to enforce the law through pursuit or apprehension of the suspect. Rather, she contended that her presence on the expressway at the time of the occurrence was geared toward potentially "assisting" the pursuing officers by providing traffic control should the need arise or by providing back up in the event the suspect took a hostage or started shooting at the police. Neither of these potentialities were ever actually indicated in this case. Thus, the jury was free to conclude that Officer Lee was not engaged in activity "designed to carry out or put into effect any law" (Fitzpatrick, 112 Ill. 2d at 221, 492 N.E.2d at 1296), but was merely making herself available to provide law enforcement. As we have pointed out, even if the jury took Officer Lee's testimony at face value, simply making oneself available for the possibility of law enforcement is not enough to attain immunity. See Leaks, 238 Ill. App. 3d at 17, 606 N.E.2d at 159 (finding no immunity where police officer, who was on patrol, was backing up his vehicle in attempt to ascertain whether a group of people gathered outside an apartment building where engaged in illegal activity because there was no actual indication that a crime was being committed at the time of the accident); Aikens, 145 Ill. 2d at 285, 583 N.E.2d at 490, 493 (holding that section 2-202 does not "immunize the negligent performance of all official functions and duties by police," and stating "section 2-202 immunity is a limited immunity, which dimensions are narrower than the scope of a

police officer's employment or his performance of official functions or duties").

Moreover, the jury was free to conclude that Officer Lee was not even attempting to "assist" as she described it, let alone enforcing the law, but was merely following the pursuit out of personal interest or because of her camaraderie with her fellow officers. There was evidence that 12 to 15 other police vehicles were involved in the pursuit. Further, the police department general order specifically limited police participation in pursuits without providing an exception for "assistance," by stating that pursuits could be conducted by only two vehicles and that other officers shall "remain aware of the direction and progress of the pursuit, *but will not actively participate, and will not respond or parallel the pursuit on adjacent streets, unless specifically authorized to do so.*" (Emphasis added.) Viewed in a light most favorable to Hudson, these facts seriously call into question whether Officer Lee was truly attempting to enforce the law, or, for that matter, whether she was even attempting to "assist;" such questions must be resolved by the jurors as the triers of fact. The dissent does not give adequate weight to our duties to sustain the findings of fact by the jury where there is sufficient supporting evidence and to refrain from overriding those findings where they conflict with our own value judgments.

The dissent fails to note the distinction between a police officer in the act of law enforcement and one who is merely making herself available for law enforcement like an officer on routine patrol. For instance, the dissent notes that we commented that Officer Lee would have been immune had she actually been attempting to provide traffic control. The dissent calls our statement puzzling and asserts that we have ignored that Officer Lee testified that traffic control was one of the first things she "might" be required to do. However, the opposite is true; we made

this statement in direct reference to Officer Lee's testimony wherein she disclaimed any attempt to engage in the pursuit but noted that she was going to see if she might become needed for traffic control or other exigencies that might arise. This distinction, that immunity is available only for those efforts to execute or enforce the law where a need for such execution or enforcement is actually indicated, was clearly made by Leaks and is consonant with Fitzpatrick, where a police officer was found to be immune because he was in the act of investigating a traffic accident when the plaintiff's injury occurred. The dissent attempts to distinguish Leaks from the instant case by noting that, here, there was, in fact, a crime committed while there was no specific indication of any crime in that case. However, the dissent fails to acknowledge that Officer Lee specifically removed herself from enforcement related to the crime in this case in that she disclaimed any attempt to participate in the pursuit. Here, the jury was well able to infer from Officer Lee's testimony that her "assistance" was, at best, an unfocussed attempt to make herself available for as yet unrealized opportunities for law enforcement.

The dissent further points to Lieutenant Jackson's testimony that police officers have a general duty to "assist" other officers and contends that this duty to "assist" was unrebutted. However, in giving great weight to Lieutenant Jackson's testimony, the dissent fails to consider Officer Lee's description of what she was doing when she said that she was going to assist, namely, that she was going to see if she might become needed to provide traffic control or backup. Implicitly, the dissent also fails to recognize that our supreme court in Aikens clearly stated that not every police duty constitutes enforcement of the law for purposes of section 2-202 immunity.

53

Moreover, while placing great emphasis on Lieutenant Jackson's testimony, the dissent fails to recognize other evidence supporting the inference and conclusion that Officer Lee was merely following the pursuit out of personal interest or camaraderie rather than in response to any police duty to "assist." As noted, the police department general order, which was entered into evidence and read aloud to the jury by Officer Lee, directly discouraged police officers from taking any active part in pursuits. Specifically, the general order limited pursuits to two vehicles and directed that other officers shall "remain aware of the direction and progress of the pursuit, *but will not actively participate, and will not respond or parallel the pursuit on adjacent streets, unless specifically authorized to do so.*" (Emphasis added.) The general order further forbade "caravanning" and "following as a subterfuge for pursuit." No section of the police general order provided for "assisting" a pursuit. In addition, there was evidence that 12 to15 police vehicles were already involved in the pursuit. Thus, the jury could well have inferred that despite Lieutenant Jackson's assertion that police officer's have a duty to assist, Officer Lee's participation was not geared toward that particular end but was based on her own personal interest in the outcome or on her camaraderie with her fellow officers.

The dissent seems to attach major significance to the state of Officer Lee's emergency lights at the time of the occurrence and charges us with repeatedly suggesting that the officer's emergency lights were not engaged. In fact, we have not purported to rely upon that factor in determining whether the jury had an evidentiary basis for its verdict.[6] While there was ample

---

[6]We further note that the dissent is mistaken in its assertion that we affirmatively stated in our footnote 4 that Officer Lee's emergency lights were not activated. There, we did not purport

evidence that Officer Lee's emergency lights were, in fact, activated, that factor is relatively insignificant in this case. It is certainly not the case that a police officer will automatically be deemed to be enforcing the law whenever she has engaged her vehicle's emergency lights. Rather, the dispositive inquiry on which we have focused is whether the police officer was engaged in activity "designed to carry out or put into effect any law." Fitzpatrick, 112 Ill. 2d at 221, 492 N.E.2d at 1296.

Moreover, contrary to the dissent's position, there was some conflicting evidence on this point that the jury could have found to be persuasive. Although Officer Lee testified that her emergency lights were on, she also testified that citizen cars were "all around", "they were moving with me," and that some of them must have been passing her. Inferentially, this statement could have been construed by the jury as negating the assertion that the emergency lights were activated since citizens would presumably not pass a police car with emergency lights activated. This conclusion would also be consonant with the City's assertion that Hudson pulled out in front of Officer Lee after previously yielding to other police vehicles by moving to the shoulder. Although possible, it is doubtful that Hudson would yield to one vehicle with emergency lights and then pull out in front of another vehicle that had emergency lights activated. Furthermore, although Officer

_____

to comment on whether Officer Lee's emergency lights were activated but merely referred hypothetically, in a totally different context, to the failure to engage emergency lights as one example of a violation of the police general order that would potentially have less significance under the immunity statute than a violation of the order through participation in unauthorized pursuit.

Ray first testified that the emergency lights were on, he later said that he could not recall whether they were on. The dissent contends that Officer Ray's statement was the result of clever cross-examination by plaintiff's counsel and what he really meant to say was that he was not sure whether it was he or Officer Lee who turned the emergency lights on. However, such an analysis is one for the jury and not for the court to make. See People v. Feyrer, 269 Ill. App. 3d 734, 742, 646 N.E.2d 1244, 1250 (1994).

The dissent further strays from the essential issues of this case by charging us with misstating a portion of Lieutenant Jackson's testimony regarding a police officer's obligation to communicate with dispatch. As with the evidence concerning the emergency lights, here to, the jury was free to resolve any conflicting evidence in favor of the conclusion that, regardless of any communication with dispatch, Officer Lee's "assistance" did not amount to an actual attempt to execute or enforce any law. However, we are somewhat disturbed by the dissent's assertion that we misstated Lieutenant Jackson's testimony.

Although we did not provide an exact quote of Lieutenant Jackson's statement, we believe our paraphrasing is sufficiently accurate. To be sure, Lieutenant Jackson was asked: "If Officers Ray and Lee are assisting in the participation of an apprehension of a suspected felon, they are required under department policy and procedure to advise dispatch that they are going to be participating in that role, correct?" Lieutenant Jackson answered this question "yes," but then clarified that the dispatcher may have called for radio silence, which would have hindered Officer Lee from communicating with dispatch. Our recitation of Lieutenant Jackson's testimony reflects this fact. The dissent appears to attempt to draw a distinction between "pursuit" and

"apprehension" with regard to the duty to communicate with dispatch even though neither counsel's question nor Lieutenant Jackson's answer made any such distinction. It is inappropriate for the court to impose its interpretation of any given testimony upon the jurors who have, themselves, heard the testimony in its full context. See Maple, 151 Ill. 2d at 453, 603 N.E.2d at 512.

With regard to the special interrogatory, we believe the dissent has failed to take full account of the distinctions made in the cases we have cited. The cases make clear that whether a comment on a special interrogatory requires a reversal depends on the specific context and circumstances surrounding the comment and that where the emphasis is on the evidence rather than a need for the jury to harmonize its answer with its verdict, a reversal is not necessarily required. See Batteast, 137 Ill. 2d at 186, 560 N.E.2d at 321; Levin, 164 Ill. App. 3d at 652, 518 N.E.2d at 213; O'Connell, 285 Ill. App. 3d at 467, 674 N.E.2d at 111. Here, as discussed above, the statements made by plaintiff's counsel regarding the special interrogatory focused on the evidence and the City's burden of proof. Thus, we cannot find that the trial court abused its discretion in determining that counsel's statement was permissible. See Maple, 151 Ill. 2d at 455, 603 N.E.2d 515.

In any event, even without regard to our conclusions concerning the negligence count and the jury's finding that Officer Lee was not enforcing the law, the jury's verdict is clearly sustainable under the willful and wanton count. The dissent, however, contends that there was insufficient evidence to support the jury's finding of willful and wanton conduct and the City was, therefore, entitled to judgment *n.o.v.* The dissent notes that Patrick described Officer Lee's

vehicle going from the far left lane to the far right lane before the impact with Hudson, and that Officer Lee might have been driving slightly above the speed limit. The dissent, however, defends Officer Lee by noting that police officers may exceed the speed limit under certain circumstances and by noting that Officer Lee stated that she merged only from lane 2 to lane 1 and attempted to avoid Hudson before the impact.

Here, as with the negligence count, the dissent appears merely to focus on evidence which she, as a trier of fact, might have found persuasive but again fails to acknowledge the evidence the actual trier of fact could have relied upon. As noted above, Patrick described Officer Lee's merge across multiple lanes of traffic as a "jump," and Officer Lee testified that she was not looking at the lane she was merging into although she was aware that there were multiple civilian cars on the road. In this regard, we note that it was for the jury and not this court to weigh the testimonies of Officer Lee and Patrick with regard to their descriptions of the events leading up to the occurrence. See Feyrer, 269 Ill. App. 3d at 742, 646 N.E.2d at 1250.

The dissent also adopts the City's position that the issue instruction given to the jury on the willful and wanton count mandates a new trial. The dissent notes that this instruction "mimicked plaintiff's complaint" but fails to acknowledge that the pattern jury instruction requires just that – that the allegations of the complaint be set out. See IPI Civil (2000) No. 20.01 [12]. The issue instruction is not designed to define willful and wanton conduct; its function is simply to set out the allegations of the complaint that are supported by the evidence and have not been withdrawn or ruled out. See IPI Civil (2000) No. 20.01 [12]. Moreover, as noted, the City's alternate instruction proffered in conjunction with its objection to the given instruction suffered

from the very same deficiencies it now alleges on appeal. As previously discussed, in order to preserve an objection to a jury instruction, a party must specify the instruction's defect and provide a correct instruction. See Deal, 127 Ill. 2d at 202-03, 537 N.E.2d at 271.

Finally, the dissent contends that the video simulation was prejudicial because, as we noted, Dr. Ziewjewski created his the simulation by inputting several facts into the computer program that were not directly supported by the evidence. The dissent specifically rejects our position that Dr. Ziewjewski's use of a hard right turn in the beginning of the simulation was supported by Patrick's testimony that the vehicle "jumped" across the lanes. The dissent states that the term "jumped" is "nothing more than a colloquialism, and not a description of what actually occurred." The dissent further suggests that the term "jumped" can only be understood in its literal meaning, as in "to spring from the ground." However, as we previously indicated, before Patrick described the movement of Officer Lee's vehicle as a "jump" across the lanes of traffic, she first testified that Officer Lee's vehicle moved from the far left lane to the far right lane, stating "[Officer Lee's vehicle] come from the far left and all the way up to the right and hit him." Thus, Patrick's subsequent use of the word "jumped" merely described how the vehicle moved across the lanes. It is unreasonable to say that the use of the term "jumped" in this context was meant to indicate that the vehicle left the ground and went airborne; on the other hand, it would seem reasonable for Dr. Ziewjewski to construe Patrick's use of the term "jumped" as meaning that Officer Lee's vehicle moved across the lanes very quickly, which would have required a hard right turn. See Webster's Seventh New Collegiate Dictionary at 460 (1969) (in addition to other definitions, defining "jump" as "to give a sudden movement," "to move

59

energetically," "to move haphazardly or aimlessly").

We will not speculate whether the evidence in this case with respect to the willful and wanton count could conceivably have sufficed to support a verdict in favor of the City had such a verdict been returned. However, we are certain that there is ample evidence to support the verdict that the jury did render as to the willful and wanton count. Likewise, as discussed, there is sufficient evidence to support the verdict with respect to the negligence count. See, *e.g.*, Friedland v. Allis Chalmers Co. of Canada, 159 Ill. App. 3d 1, 9, 511 N.E.2d 1199, 1205 (1987) ("Only if the verdict was palpably erroneous and wholly unwarranted, was clearly the result of passion or prejudice, or appears to be arbitrary, unreasonable, and not based upon the evidence will it be overturned"); Kahn v. James Burton Co., 5 Ill. 2d 614, 623, 126 N.E.2d 836, 841 (1955) ("A verdict will not be set aside merely because the jury could have found differently or because judges feel that other conclusions would be more reasonable. [Citation] *** Under our system of jurisprudence, jury determinations can be set aside only when a court of review *** is clearly satisfied that they were occasioned by passion or prejudice or found to be wholly unwarranted from the manifest weight of the evidence").

## III. CONCLUSION

For all the foregoing reasons, we affirm judgment of the trial court.

Affirmed.

McNULTY, J., concurs.

Justice O'MALLEY, dissenting:

I respectfully dissent from the majority opinion in its entirety. In my view, the City was

protected by section 2-202 of the Tort Immunity Act (Act) (745 ILCS 10/2-202 (West 2004)) where Chicago police officer Sung Joo Lee was executing and enforcing the law at the time of the occurrence; moreover, the exception to section 2-202 of the Act was not triggered because none of the evidence supported a finding of willful and wanton conduct on the officer's part. This is true whether or not Officer Lee was engaged in a pursuit or simply going to assist other officers. Even when the evidence is viewed in the light most favorable to plaintiff, the City was entitled to a judgment *n.o.v.* on these counts. Further, I believe the comments of plaintiff's attorney instructing the jury to answer the special interrogatory regarding execution and enforcement in favor of his client completely eviscerated the utility of that special interrogatory and virtually ensured, in the context of this tragic accident, that the jury would answer as instructed. Finally, the jury instruction on willful and wanton conduct was fatally flawed as was the video prepared by plaintiff's expert. Where the evidence might be considered to be closely balanced, these last issues constitute reversible error and would require a new trial. (In my view, the evidence is actually not closely balanced, it overwhelmingly favors the City, but some might regard it as such.) Moreover, I am not attempting to substitute my evaluation of the facts for that of the jury, nor have I only considered evidence favoring the City, as the majority suggests, there are simply so few facts which favor the plaintiff that this verdict is not sustainable.

I fully appreciate that if we are to ever achieve finality in litigation, great deference must be given to the jury's conclusions. However, this does not demand slavish adherence to verdicts which are clearly wrong, nor does it relieve this court of its responsibility to critically review jury verdicts. It is apparent to me that this verdict is the result of passion or prejudice in the sense that it is a

sympathy verdict against a target defendant. Illinois Pattern Jury Instructions, Civil, (IPI Civil) No. 1.01 (2007 ed.) ("Your verdict must not be based upon speculation, prejudice, or sympathy.").

## EXECUTION & ENFORCEMENT

The City claims it was entitled to judgment *n.o.v.* because its officer was in the execution and enforcement of the law and I agree. Section 2-202 of the Act immunizes all municipal employees for their acts or omission in the execution and enforcement of the law. See 745 ILCS 10/2-202 (West 2004). As principal and agent, the City is immunized where its employee is immunized. 745 ILCS 10/2-109 (West 2004); *Wade v. City of Chicago*, 364 Ill. App. 3d 773, 780 (2006). Where a police officer is engaged in a course of conduct designed to carry out or put into effect any law, the immunity applies unless his or her conduct was willful and wanton. *Fitzpatrick*, 112 Ill. 2d at 221; 745 ILCS 10/2-202 (West 2004). Here, Officer Lee was, in my view, so engaged and nothing she did could properly be considered willful and wanton conduct.

The evidence showed that at about 9 p.m. on May 7, 2001, Officer Lee and her partner, Officer Howard Ray, normally assigned to protect Chicago Housing Authority residents, heard a radio dispatch that a homicide suspect was being pursued on the Eisenhower expressway by other officers. Lee and Ray entered the expressway, not to engage in the pursuit, but rather to assist in the eventual apprehension of the suspect, either by controlling traffic at the scene or any other helpful activity. The night was clear and dry, and the highway well lit. At one point after entering the expressway, Lee was required to get off the eastbound expressway and get on the expressway westbound because the pursuit changed directions. Going westbound, with her turn signal and emergency equipment activated, she moved from the first to the third lane, and collided with plaintiff

because his car either protruded from the shoulder into Lee's lane, or he pulled out from the shoulder in front of her.

The testimony of Chicago police Lieutenant Carolyn Jackson established that all officers were expected to assist other officers should the occasion arise, and no permission from superiors was required for such a decision. Contrary to what the majority implies, I gave Jackson's testimony no more weight than it deserved. Lieutenant Jackson is a ranking officer in the Chicago Police Department, and her testimony was entirely unrebutted. I have taken issue with a statement which appears in the majority opinion: the majority states that Lieutenant Jackson testified that "if Officers Lee and Ray were assisting in apprehending a suspected felon, they were required under department policy and procedure to advise dispatch." This indicates that if these officers were doing exactly what they *said* they were doing—attempting to assist in the apprehension of a suspected felon—they were required to notify dispatch or be in violation of a general order. After reviewing over 57 pages of Lieutenant Jackson's testimony, taken in context, it is my position that that is not a correct interpretation of what she said in spite of the majority's protest regarding the same. She made it crystal clear that it was only officers engaged in or assisting in the *pursuit* who had to notify dispatch, those being the primary and secondary cars. In her opinion, an officer was not involved in a pursuit unless they could see it, and these officers undisputedly could not see the pursuit because they had to monitor their radio to know where it was going. The majority states its presentation is fair, because it then mentions "countervailing evidence" regarding Jackson's comments about anticipated radio silence. However, these remarks regarding radio silence have little to do with the issue of whether Lee and Ray violated a general order in not contacting dispatch (except they might not get

through if they tried). Jackson's real opinion is to be found in the veritable *mountain* of contradictory evidence which shows that it is the opposite of what is said in the majority opinion. Jackson testified that she believed Lee and Ray were not involved in a pursuit, so they were not required to contact dispatch. Further, she clearly maintained that Officer Lee not only did *not* violate a general order, but she did nothing wrong.

To address a preliminary matter, while the majority claims that whether or not Lee's emergency equipment was activated is insignificant to its opinion, I think it is an important factor and further, it is repeatedly referred to in the majority opinion and used as at least a partial basis for some of its conclusions. Therefore, I think it worthy of comment. In my view, there can be no serious dispute that Lee's equipment *was* activated. Both officers testified that the emergency equipment was on. Even if one chose to disregard their testimony as biased, an independent witness, Denise Patrick, testified that the lights and sirens were on. Most importantly, the plaintiff, Vernon Hudson, testified to seeing the officers' lights *behind him* and hearing the siren moments before the crash.

In spite of this evidence, the majority maintains that it is "questionable" whether the emergency equipment was on, choosing to base its conclusion that the equipment may not have been on primarily upon a halting, confused, bit of cross-examination where Officer Ray is questioned by plaintiff's attorney, as well as two bits of speculation it then offers. Ray stated as follows:

> Q. [Plaintiff's Attorney]  Did *you* put the lights on, the
>
> oscillating lights and siren on?
>
> A. [Officer Ray]  I can't recall.
>
> Q. As you sit in this courtroom, you don't have any memory

of turning them on, do you?

A. *I know they were on*, but I don't—I can't recall—I don't know what—I would have to see the car because sometimes the lights are on the driver's side, and then sometimes they're on my side.

Q. But as you sit here today, you don't remember if they were on.

A. No, I can't recall." (Emphases added.)

It is clear to me that Officer Ray was responding to the first question—inquiring whether *he* turned the lights and sirens on—presumably as opposed to Officer Lee. The next question skillfully and quickly moves from whether he himself turned on the equipment to whether it was on at all, and he became confused, and responded again that he did "not recall." Aside from a bit of speculation to be discussed below, this is the only genuine piece of evidence in a record where everybody else involved, *including* plaintiff, testified to seeing Lee's lights and hearing sirens immediately before the crash.

Nonetheless, the majority claims that, aside from Ray's testimony above, there is other evidence that Lee's equipment was not activated, speculating upon two bits of testimony from Lee herself. Initially, Lee agreed at trial that upon entering the highway, there were "cars all around" and "some must have been passing her." (These were actually plaintiff's lawyer's words; however, Lee agreed, albeit hesitatingly). The majority then posits that no one would be passing a police car with lights and sirens activated, so Lee's equipment was probably not on. In fact, in my view, common sense dictates otherwise. Lee said she activated her equipment upon entering the Eisenhower.

Where this happens, it usually takes a number of minutes for other drivers to react and move out of the way. Cars certainly do not disappear instantaneously, and cars in front of her or slightly ahead of her may well have to pass to get to the right shoulder. I acknowledge that while this inference might conceivably be considered evidence that her equipment was not activated, in view of the solid testimony that it was, the latter seems unfounded. Further, if cars were actually "moving with her," it corroborates her testimony that she was going 45 to 50 miles per hour, not 55 to 65 as Denise Patrick said.

Another reason the majority suggests that the emergency equipment was not activated presents an interesting issue. Officer Lee testified that Mr. Hudson pulled out in front of her, but Mr. Hudson maintained he pulled to the shoulder in response to lights and sirens behind him. The majority then speculates that Mr. Hudson actually pulled to the shoulder in response to the *pursuers'* lights and sirens, then pulled back into the roadway in front of Lee. The majority then states that while possible, it would be illogical to think that Mr. Hudson would pull over for one set of lights, but pull out in front of Lee if her equipment was activated, so it must mean Lee's equipment was not on. If true, it would have Mr. Hudson pulling over, waiting for some period of time because the pursuers were well ahead of Lee and she could not even see them, and then pulling out in front of a lightless, sirenless Lee.

However, Mr. Hudson's testimony contradicts this scenario. He says he was pulling *over* in response to the lights, not pulling *out*, when he was hit. In any event, whether pulling out or pulling over, Mr. Hudson maintained that he reacted immediately upon seeing lights in his rearview mirror and hearing sirens, and was struck only *seconds* later. Since it is indisputable that it was Lee who hit

66

him, not the pursuers, it *had* to be Lee's equipment Mr. Hudson saw and heard.

The more interesting aspect of this is, had the jury believed that Mr. Hudson pulled in front of Lee, as Officer Lee stated, there can be no question that this verdict is incorrect, and the product of sympathy and / or prejudice. The verdict form reveals that the jury found plaintiff 0% negligent and the officers 100% negligent. If plaintiff pulled in front of the officers, this accident would essentially be his fault and surely the verdict would reflect *some* substantial percentage of negligence on the part of plaintiff. I believe it to be common knowledge on the part of drivers that one is required to yield when pulling into moving traffic from the shoulder of the road. See 625 ILCS 5/11-905 (West 2006); 625 ILCS 5/11-709.1 (West 2006). In fact, either way, it is evident Mr. Hudson's car occupied some part of Officer Lee's lane, so it is surprising that the jury still found him 0% negligent. I take this to be evidence of the jury's bias against the defendant City.

In one footnote, the majority hypothesized that the emergency equipment was *not* on, and the officers were driving in violation of a general order to activate it if in a pursuit. Slip op. at 28-29, n. 4. It then speculates, wholly without citation, that such conduct would "arguably" somehow render the officers unable to enforce the law. Slip op. at 28-29, n. 4. While this may be just a hypothetical, I note that there is simply no support in the record or in the law for this position, and none is offered. Would the majority also maintain that if these officers had apprehended the suspect after pursuing without permission, the arrest would be illegal?

As for a discussion of case law, the majority then offers something of a survey of the law where officers have and have not been found to be in the execution and enforcement of the law. The first cases are those in which officers were found to be in the execution and enforcement of the law.

See *Bruecks v. County of Lake*, 276 Ill. App. 3d 567 (1995), *Morris v. City of Chicago*, 135 Ill. App. 3d 374 (1985), and *Fitzpatrick v. City of Chicago*, 112 Ill. 2d 211 (1986).

*Bruecks* and *Morris* are virtually identical to the case at bar, although this case is even more compelling for finding the officers within section 2-202. In *Bruecks*, an officer heard a report of shots fired in the area. *Bruecks*, 276 Ill. App. 3d at 568. Although other officers were responding to the scene, the officer decided to respond as well. *Bruecks*, 276 Ill. App. 3d at 568. Unlike Officer Lee, he did not activate his emergency equipment and stated that he did not consider the situation to be an emergency. *Bruecks*, 276 Ill. App. 3d at 568. He was involved in an accident on the way to the scene, negligently striking plaintiff's vehicle. *Bruecks*, 276 Ill. App. 3d at 568. The court stated that the officer was "clearly" being called upon to execute the law. *Bruecks*, 276 Ill. App. 3d at 569. The fact that he was not specifically dispatched to the scene, did not have his emergency equipment activated, and did not subjectively consider this to be an emergency did not affect the court's decision. *Bruecks*, 276 Ill. App. 3d at 569. In this case, Officer Lee responded to a radio call and decided to go to the assistance of other officers, although not specifically dispatched to the scene and in spite of the fact that others were also responding. Unlike *Bruecks*, however, Officer Lee *did* have her emergency equipment activated. As in *Bruecks*, Officer Lee was in the execution and enforcement of the law and our result should be the same.

Similarly, in *Morris v. City of Chicago*, 130 Ill. App. 3d 740 (1985), the court held that an officer who struck plaintiff in plaintiff's parked car while responding to a radio call of a crime in progress was executing and enforcing the law and therefore immune under section 2-202. *Morris*, 130 Ill. App. 3d at 741, 744. The court found that the immunity applied because, at the time of the

accident, there was an "unbroken effort" on the officer's part to respond to the call and thereby execute and enforce the law. *Morris*, 130 Ill. App. 3d at 744. The court did not agree that the officer could not be said to be executing and enforcing, because he did not actually see a crime in progress. *Morris*, 130 Ill. App. 3d at 743. Here too, there was an "unbroken effort" on Officer Lee's part to respond to the radio call as she thought appropriate. Like *Morris*, there *was* a crime in progress here as well: a homicide suspect eluding the police. See 625 ILCS 5/11-907 (West 2004). (Whether or not a crime has been, or is being committed seems to be key in the case law. See *Bruecks*, 276 Ill. App. 3d at 568-69; *Morris*, 135 Ill. App. 3d at 744; *Bosen v. City of Collinsville*, 166 Ill. App. 3d 848, 850-51 (1987); and *Leaks v. City of Chicago*, 238 Ill. App. 3d 12, 14-15 (1992)). *Morris* is, in my view, indistinguishable and indeed the majority makes no effort to distinguish it. *Bruecks* and *Morris* are therefore controlling in the case at bar and should be followed.

In its order, the majority then moved on to discuss an "extensive" line of cases which find that the public employee involved was not executing and enforcing the law. I acknowledge that there are many such cases, but every one on which the majority relied is so factually different from this case as to be wholly inapposite. In *Aikens v. Morris*, 145 Ill. 2d 273 (1991), the supreme court found that the act of transporting prisoners was not covered by the immunity. In *Simpson v. City of Chicago*, 233 Ill. App. 3d 791 (1992), an officer on his way to fill out a missing persons report was not immune. In *Leaks v. City of Chicago*, 238 Ill. App. 3d 12, 14-15 (1992), a police officer cruising on routine patrol had an accident while backing up after stopping at a corner where some individuals were gathered. Although he maintained that he suspected drug activity, the court disagreed, saying no immunity applied where no crime had in fact been committed, the officer had nothing more than

a suspicion that a crime had occurred, and he was essentially just cruising. *Leaks*, 238 Ill. App. 3d at 17. In *Sanders v. City of Chicago*, 306 Ill. App. 3d 356, 359 (1999), an officer was initially traveling to assist another officer, but he received word that the emergency was over prior to having an accident. The court disagreed with the trial court's granting of summary judgment in favor of the City, instead granting summary judgment for the plaintiff, holding that the officer was not immune as a matter of law. *Sanders*, 306 Ill. App. 3d at 361-62. Clearly, these situations are dramatically different than the one in the case at bar. All the conduct by the officers in the aforementioned cases was either ministerial or routine, or became routine by the passing of an emergency (see generally, *Sanders*, 306 Ill. App. 3d at 359-62). Indeed, these cases stand for the proposition that routine activities are generally not immunized. *Leaks*, 238 Ill. App. 3d at 17; *Aikens*, 145 Ill. 2d at 278-79; *Simpson*, 233 Ill. App. 3d at 792-93. However, these situations are wholly unlike going to assist in the apprehension of a homicide suspect who was contemporaneously committing a crime.

In terms of analysis, the entire majority memo first adopts the position that the officers were not in the execution and enforcement of the law because they were not going to assist as they said, but were actually involved in a pursuit in violation of a general order. I note that the violation of a general order may be some evidence of *willful and wanton* conduct (although not here), but no cases support the proposition that a violation of a general order strips an officer of immunity or the ability to enforce the law (the significance of such a violation, or lack thereof, is extensively discussed in the section of this dissent addressing willful and wanton conduct).

According to the majority, it would be reasonable for the jury to inferentially conclude that the officers were actually pursuing, not going to assist, because they "closely" monitored their radio

and changed lanes in response to what lane the fleeing felon was occupying. Both these things actually corroborate Lee's position that she was going to assist, not pursuing, and not the other way around. Initially, I note that Lieutenant Jackson's unrebutted testimony was that officers are not in pursuit or caravanning unless they could see the pursuit. Lee said she could not see the pursuit, but further, if she could, it would not have been necessary to monitor her radio to know where she was going or in what lane the felon was driving. Instead, Lee was clear that she never saw the white van that was being pursued, and that she moved into the far right-hand lane only so that she would be traveling "in the same direction" if the suspect again exited the expressway as he had previously done. In short, all of this confirms Lee's testimony that she was going to assist, not engaged in a pursuit. If the jury believed otherwise, it would, in my view, be against the manifest weight of this evidence. See *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178 (2006) ("A new trial should be granted only when the verdict is contrary to the manifest weight of the evidence."). A verdict is against the manifest weight of the evidence when the opposite conclusion is clearly apparent. *Redmond v. Socha*, 216 Ill. 2d 622, 651 (2005). Here, it is.

The majority then turns the tables and states that the officers could not be in the execution and enforcement of the law because they *were* going to assist and were not the direct pursuers. Specifically, the majority delineates five specific reasons why the jury was justified in concluding that Lee was not enforcing the law if she was actually going to assist other officers: First, because Lee denied being in direct pursuit, or that she would be "hands-on" in apprehending the criminal; second, because Lee said that she was going to assist in the apprehension, she was merely "available" to enforce the law, not enforcing it; third, related to "availability," because she was uncertain exactly

71

what assistance would be required, her efforts were simply "unfocused" availability, conduct purportedly not entitled to immunity; fourth, the law being enforced was "nebulous"; and finally, the fifth reason the jury's verdict is allegedly justified is because they could reasonably believe that Lee and Ray joined in this endeavor for their own amusement–out of curiosity or camaraderie with fellow officers–and were therefore not enforcing the law. None of the above reasons supports the latter conclusion, in my view.

First, the majority's position that only prime actors, direct pursuers, and / or those who are first to apprehend the criminal enjoy immunity, finds no support in the law. Rather, the opposite is true, as *Bruecks v. County of Lake*, 276 Ill. App. 3d 567 (1995), *Morris v. City of Chicago*, 135 Ill. App. 3d 374 (1985), and *Bosen v. City of Collinsville*, 166 Ill. App. 3d 848 (1987), demonstrate. In those cases, officers began to travel to a scene in response to information received on their radios, as Lee and Ray did here; like *Morris*, here other cars were responding. *Morris*, 135 Ill. App. 3d at 742. None of the officers knew exactly what would be required when they arrived. In addition, in *Bosen*, the officer was exceeding the speed limit, as Lee is alleged to have done here, although the officer in *Bosen* was estimated to be traveling at 50 miles per hour on wet pavement in a 25 miles-per-hour zone as he responded to a radio call. As in the instant case, the officers in all three cases had an accident prior to reaching the scene, so none actually arrived. Nonetheless, the court found each officer to be unequivocally immune. See *Bruecks*, 276 Ill. App. 3d at 568-69, *Morris*, 135 Ill. App. 3d at 744, and *Bosen*, 166 Ill. App. 3d at 850-51.

Next, the majority maintains this verdict is justified because Lee was only attempting to *assist* in an apprehension, which allegedly amounts to simply making oneself "available" to enforce the law

72

(citing *Leaks*), and does not trigger the immunity. Further according the majority, where Lee did not know precisely what would be required of her when she arrived (traffic control or some other activity), her efforts were tantamount to an "unfocused" availability because no specific law was being enforced, or it was a "nebulous" one, not triggering immunity. I do not believe any of these arguments have merit.

I initially note that, in a sense, all officers are "available" for law enforcement just by walking into the Area to report for their shift, and certainly while they are carrying out routine duties on their watch. There is, however, a qualitative difference between that kind of routine availability and the conduct of the officers here. It would be disingenuous to claim that Lee's "availability" as she responded to this emergency is in any way the same as the availability of the officer on routine patrol in *Leaks*. Furthermore, there is no case law that supports the majority's holding that immunity does not apply when officers are only "available" to enforce the law, certainly *Leaks* and *Aikens* do not. One might say that the officers in *Bruecks*, *Morris*, and *Bosen* were merely available at the time they heard the radio transmission. Where they took a substantial step to respond, however, mere availability was transformed into law enforcement activity and they were deemed to be immune. See *Bruecks*, 276 Ill. App. 3d at 568-69; *Morris*, 135 Ill. App. 3d at 743-44; and *Bosen*, 166 Ill. App. 3d at 850-51. The officers in the case at bar should also be immune.

Puzzlingly, the majority comments that there is "little doubt that had Officer Lee been *on her way* to provide traffic control," or "had the lead officers *** requested backup ***," immunity would apply. (Emphasis added.) Slip op. at 27-28. First, this ignores, or claims the jury rejected, the fact that the officer's testimony was unrebutted that she *was on her way* to provide traffic control or do

anything else which might be helpful. Second, Lt. Jackson testified that officers were expected to provide assistance, and that decision was up to them. Where officers are expected to provide assistance, it stands to reason that no request for backup has to be made either. Thirdly, nothing in the Act precludes immunity and no case is cited that stands for the proposition that an officer is stripped of immunity solely because no backup was requested or permission given. 745 ILCS 10/2-202 (West 2004).

Further, there is no confusion about what law was being enforced, nor is it "nebulous." It is illegal to elude the police and indisputably, this is the law that was being enforced; Lee and Ray's conduct is clearly referable to that law. Simply because the officers did not know what activities would be required to *enforce* that law when they arrived, or whether some other law or laws would simultaneously require enforcement at the scene, *i.e.*, traffic control, etc., does not make this conduct "unfocused" or strip them of immunity. The majority states "The only law that was in actual need of enforcement related to the apprehension of the criminal suspect, and Officer Lee explicitly denied that she was taking part in that enforcement." Slip op. at 28. (Notably, the only thing Lee "explicitly denied" was being involved in a *pursuit*, not law enforcement—she testified that she intended to assist at the eventual apprehension if such was required, and that *is* law enforcement. See *Bruecks*, 276 Ill. App. 3d at 568-69; *Morris*, 135 Ill. App. 3d at 744; and *Bosen*, 166 Ill. App. 3d at 850-51.). The officers here were clearly "engaged in a course of conduct designed to carry out or put into effect *any* law." *Wade v. City of Chicago*, 364 Ill. App. 3d 773, 780 (2006).

The majority cites *Leaks v. City of Chicago*, 238 Ill. App. 3d 12 (1992), as authority that being "available" to enforce the law does not trigger the immunity. *Leaks* is completely different

factually and is wholly inapplicable to the case at bar in my view. In *Leaks*, an officer on routine patrol backed over someone when leaving a gathering of individuals on a corner. The court said he was not entitled to immunity because he merely had a "suspicion" that a crime had been committed (drug activity) where one had actually not been committed. *Leaks* does not, as the majority claims, support a proposition that "availability" to enforce the law does not trigger immunity and in fact no case does. See *Bruecks*, 276 Ill. App. 3d at 568-69; *Morris*, 135 Ill. App. 3d at 743-44; and *Bosen*, 166 Ill. App. 3d at 850-51. In the instant case, unlike *Leaks*,[7] there is nothing routine about a homicide suspect eluding the police and an emergency situation that demanded the attention of many officers. Here, Lee and her partner were either responding to a specific call outside their district about a specific crime in progress at a specific place, the Eisenhower, to assist in the anticipated arrest in any way that was helpful, or they were pursuing under the same circumstances, albeit in violation of a general order to notify. Either way, simply because they had an accident prior to having the opportunity to carry out this task in no way diminishes Lee's entitlement to immunity under the Act. See *Bruecks*, 276 Ill. App. 3d at 568-69; *Morris*, 135 Ill. App. 3d at 743-44; and *Bosen*, 166 Ill. App. 3d at 850-51; see also 745 ILCS 10/2-202 (West 2004). Thus, the jury was not "free to conclude,"

---

[7] Moreover, *Leaks* is not "consonant" with *Fitzpatrick v. City of Chicago*, 112 Ill. 2d 211 (1986), as the opinion states. In fact, *Fitzpatrick* is far more supportive of the dissent than the majority opinion. In *Fitzpatrick*, no crime had occurred, simply a traffic accident which required investigating. Accident investigation comes closer to the routine conduct of the officer in *Leaks* than that of the officers in in the case at bar. Nonetheless, in *Fitzpatrick*, unlike *Leaks*, the officer was immune.

as the majority states, that she was not enforcing the law.

The majority next claims that the jury was again "free to conclude" that the officers were not enforcing the law because they joined in this pursuit for their own amusement, either out of personal curiosity or camaraderie with their fellow officers. First, I note that there is not a scintilla of evidence that this was the reason these officers responded. The jury may also have concluded that they were not enforcing the law because they were going to the movies or the beach, but that would not be justified either. I acknowledge that the jury is free to draw reasonable inferences *from the evidence*, but they are not free to indulge in pure, unsupported speculation or flights of fancy. See generally, IPI Civil, Nos. 1.01 and 3.04. Moreover, the fact that "12 to 15" cars were involved in this effort is irrelevant and does not bolster the majority's "camaraderie" argument, because neither Lee nor Ray knew how many cars were involved. In fact, it appears that no one knew, at the time of the incident, how many cars were involved until after the incident was over.

Moreover, I note that neither personal curiosity nor camaraderie is inconsistent with enforcing the law. It is reasonable to assume that there is some curiosity to learn about a situation and more that a bit of camaraderie involved in any effort officers make to assist each other or ensure one another's safety. This does not mean that because camaraderie or personal interest is part of the motivation for some law enforcement activity, that such activity may not still be legitimately characterized as law enforcement, entitling the officers so engaged to immunity. For example, if officers rush to assist an officer down at the scene of a bank robbery, and have an accident on the way, they would be, in my view, enforcing the law, even though part of their motivation stems from a feeling of camaraderie or loyalty to a fellow officer. See generally, *Bruecks*, 276 Ill. App. 3d at

568-69; *Morris*, 135 Ill. App. 3d at 743-44; and *Bosen*, 166 Ill. App. 3d at 850-51. Therefore, camaraderie or even curiosity cannot be said to be mutually exclusive with law enforcement, and I know of no case which holds otherwise.

Finally, on the point of enforcement, the majority insists that, when viewed in the light most favorable to Mr. Hudson, where General Order 97-03 provides that only two cars may pursue without an "exception for assistance," it "seriously calls into question" whether Lee was "truly attempting" to enforce the law or "even assist." I frankly completely fail to see how one flows from the other. Even if Lee were involved in a pursuit in violation of a general order (to seek authorization), how does that "seriously call into question" whether she was "truly attempting to enforce the law" or "assist" in its enforcement? She would simply have missed a step–she did not call in. This argument suggests that the majority incorrectly elevates the violation of a general order to the violation of an actual law, perhaps taking the officer outside the scope of his or her employment and making him unable to enforce the law, or some such theory (as it intimated in a footnote in the opinion). However, the majority is aware, as the jurors are not, that internal standards of any organization have no legal effect whatsoever, their violation is not even negligence *per se*; such a violation, if one occurred here, certainly did not remove the officers from the scope of employment. See *Wade v. City of Chicago*, 364 Ill. App. 3d 773, 781 (2006), citing *Morton v. City of Chicago*, 284 Ill. App. 3d 444, 454 (1997). Further, there is no authority to support an argument that an officer cannot be enforcing the law if in violation of a general order, and the majority cites to none.

## COMMENT ON SPECIAL INTERROGATORY

Related to the above discussion of execution and enforcement of the law, is plaintiff's

attorney's comment on the special interrogatory relating to enforcement in closing argument. Counsel stated, "Ladies and gentlemen[,] if you're for Vernon[,] you will answer this special interrogatory [N]o." This comment completely eviscerated the purpose of the special interrogatory, which is to test a general verdict (*Simmons v. Garces*, 198 Ill. 2d 541, 555 (2002)), and could not fairly be said to be made "in accordance with the evidence" as case law requires. *Batteast v. Wyeth Laboratories, Inc.*, 137 Ill. 2d 175, 186 (1990). The comment appears by itself at the end of counsel's closing. With regard to placing it in the context of the evidence, counsel's sole effort to do that, if indeed that is what it was, was an off-handed reference to "other arguments" regarding "their affirmative defense made earlier." There is no attempt to define the limits of enforcement or draw the jury's attention to what is and is not enforcement, or exactly what Officer Lee did to take her out of the parameters of enforcement. The majority states that the comment is permissible because counsel did not "solicit the jury to harmonize its answer to the special interrogatory with its verdict nor did he delineate or emphasize the need to answer the special interrogatory with a 'no' if it wanted to award plaintiff damages." It seems to me he actually did both when he told the jury if they were "for Vernon"–in other words, if they wanted to give Vernon a verdict, *i.e.*, money, they would answer the interrogatory "No." His remark emphasizes the relationship between the answer to the interrogatory and the verdict in no uncertain terms and I think it is incorrect to say it does not.

*Batteast v. Wyeth Laboratories, Inc.*, 137 Ill. 2d 175, 186 (1990), cited by the majority in its opinion, is more supportive of the dissent. In *Batteast*, the supreme court found a comment which was virtually identical to the one in this case to be improper where that lawyer told the jury that if they wanted to make an award in favor of plaintiff they had to answer an interrogatory a certain way.

78

The *Batteast* court unequivocally found this comment to be improper, but reversed on other grounds, so we will never know if they would have reversed if the comment was the sole issue.

In *O'Connell by Nelson v. City of Chicago*, 285 Ill. App. 3d 459, 467 (1996), the court stated that lawyers could make mention of special interrogatories, "but the line is crossed when jurors are told to harmonize or confirm their interrogatory answer with their general verdict." I presume this directive from the case law does not mean such remarks are only objectionable where the magic words "harmonize" or "conform the verdict" are used. Where that is the actual *effect* of a comment, I believe it to be improper. See generally, *O'Connell by Nelson v. City of Chicago*, 285 Ill. App. 3d at 467. Here, counsel's directive to the jury, in my view, had just such an effect. Simply because the comment was only made once, "briefly," as the majority states, taken in context or in any other way, this comment was reversible error and literally shaped the jury's finding that this officer was not in the execution of the law where the evidence shows she was. *Sommese v. Maling Bros., Inc.*, 36 Ill. 2d 263, 268 (1966) (holding that the statement by plaintiff's attorney to the jury during closing argument to "harmonize" its answer on the special interrogatory with its general verdict was improper).

Significant to our case, the *Sommese* court also stated that "[e]ven if an objection had been made to the argument and sustained, defense counsel would be unable to overcome the fact that the jury had already obtained the forbidden information, not only as to the source of the interrogatory, but as to the effect of the interrogatory." *Sommese*, 36 Ill. 2d at 268. Like *Sommese*, in the case at bar, the City objected, it was sustained, and the jury was later instructed that argument is not evidence. However, under these circumstances, I would not indulge in what is often a legal fiction

that the bell can be unrung by an instruction to disregard. See *Sommese*, 36 Ill. 2d at 268. While *Sommese* is slightly different in that there, the lawyer told the jury which side had submitted the special interrogatory, the attorney's actions in this case improperly let the jury know the effect of the answer. I also note that, where counsel instructed the jury not to find Officer Lee in the execution and enforcement of the law if they were "for Vernon," they were also alerted to the inextricable link between their answer to the interrogatories and the final outcome of the case—a link juries do not necessarily make on their own. This may well have influenced their answer to the next special interrogatory regarding willful and wanton. Finally, even though this improper comment occurred only once, it was so prejudicial as to deny defendant a fair trial, and is reversible error on that ground alone. *Ramirez v. City of Chicago*, 318 Ill. App. 3d 18, 26 (2000).

## WILLFUL & WANTON

The plaintiff contended, and the jury and the majority agreed, that even if Officer Lee was in the execution and enforcement of the law, her conduct was willful and wanton, bringing her within the exception found in section 2-202 of the Act. I disagree.

Willful and wanton conduct is "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210 (West 2004). Willful and wanton conduct consists of more than mere inadvertence, incompetence, or unskillfulness. See *Geimer v. Chicago Park District*, 272 Ill. App. 3d 629, 637 (1995). As the courts have interpreted this phrase, proof is required that the defendant knew that his or her actions were likely to cause injury to another. In *Medina v. City of Chicago*, 238 Ill. App. 3d 385, 392 (1992), for example, this

court described conduct as willful and wanton when "a person *** ignores known or plainly observable dangerous conditions and does something that will naturally and probably result in injury to another." To prove willful and wanton conduct, a plaintiff must show that the defendant, "by deliberately inflicting 'a highly unreasonable degree of harm' on the plaintiff, 'approache[d] the degree of moral blame attached to intentional harm.' " *Morton v. City of Chicago*, 286 Ill. App. 3d 444, 452 (1997), quoting *Burke v. 12 Rothschild's Liquor Mart, Inc.*, 148 Ill. 2d 428, 448 (1992) (alteration in original); *accord Wade v. City of Chicago*, 364 Ill. App. 3d 773, 783 (2006).

In the opinion, the majority states the jury verdict is "clearly" sustainable on willful and wanton apparently for two reasons: because Lee allegedly made a "hard right turn," and the officer's car purportedly "jumped" across two lanes. I initially note that the "hard right" turn, which the majority relies on as "clear" evidence of willful and wanton conduct, was literally *made up* by the expert and is nowhere to be found in the evidence. I acknowledge that Lee would have had to veer to the right to cross lanes, but if she executed what most of us consider a "hard" right turn, *i.e.*, as in turning a corner, she would have been going sideways across the lanes. There simply is no evidence of a hard right turn, and "jumping" (as described by Denise Patrick) across multiple lanes does not, in my view, provide corroboration of a hard right turn or anything else; in fact, no one even knows what is meant by this term.

In the first place, I think it obvious that "jumped" in this context is nothing more than a colloquialism, and not a description of what actually occurred. The majority complains that I take the term "literally" and I maintain that this is the only appropriate way *to* take it–to define the word by its plain and commonly accepted definition. Unlike the majority's dictionary definition, my

Webster's defines jumping to mean, "to spring from the ground...," sudden leap "upward" (Webster's New Compact Format Dictionary Book Essentials Publications 1987): obviously, it would border on the ridiculous to claim that Lee's car was actually jumping or "leaping upward," where the highest speed anyone claims she was going is 65 miles per hour on dry pavement.

The majority instead applies an alternative definition, "moving quickly," apparently from a different Webster's. I would agree that if Lee was going up to 65 miles per hour, some might equate that with "moving quickly." I do not agree, however, that going at a speed permissible by law for conditions and veering right to cross two lanes after exercising due care, which is all she essentially did, could conceivably be raised to the level of willful and wanton conduct. While it is true that jurors may properly find something willful and wanton in one case and simply negligence in another, mere incompetence or inadvertence is not enough (*Geimer v. Chicago Park District*, 272 Ill. App. 3d 629, 637 (1995)); willful and wanton always must have a quasi-intentional character that is entirely lacking here. *Murray v. Chicago Youth Center*, 224 Ill. 2d 213, 237 (2007). Fictional "hard right" turns and "jumping" police cars are hardly "clear" evidence of willful and wanton conduct, in my view. In fact, such evidence is virtually illusory when compared to the real evidence of the officers' conduct in the instant case.

In that regard, a thorough review of what plaintiff says amounts to willful and wanton conduct plainly shows that none of these acts, standing either alone or in conjunction with each other, comes close to meeting the high bar of reckless disregard required for willful and wanton. Five of plaintiff's allegations accuse the officers of some violation of a general order regarding pursuit (b, c, i, j, and k), two allude to simple driving violations which plaintiff claims is in derogation of a general order

82

(a and h), and some (a, e, f, and g) are only allegations relating to violation of various rules of the road under the Illinois Vehicle Code (625 ILCS 5/11-100 *et seq.* (West 2004)). Most amounted to nothing more than negligence, and the addition of the word "recklessly" does not transform conduct which is merely negligent into willful and wanton, *i.e.*, "Recklessly failed to maintain control over her motor vehicle," "Recklessly executed a lane change, striking Vernon Hudson's motor vehicle," etc. See *Winfrey v. Chicago Park District*, 274 Ill. App. 3d 939, 943 (1995) ("When the plaintiff is alleging that the defendant engaged in willful and wanton conduct, such conduct must be shown through well-pled facts, and not by merely labelling [*sic*] the conduct willful and wanton."); *Robb v. Sutton*, 147 Ill. App. 3d 710, 714 (1986) ("Recklessness connotes wilful [*sic*] and wanton conduct.")

Further, in my view, Officer Lee's conduct could not be classified as willful and wanton as I understand the term, even if she had been engaged in a pursuit without permission and in violation of a general order. The majority states that a violation of a general order may be considered by the jury to be "some" evidence of willful and wanton conduct and I acknowledge that it may be. See *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252, 256 (1999). Significantly, however, in order to be considered even "some" evidence of willful and wanton conduct, the violation of the general order in and of itself, must be a proximate cause of this accident or one of them. See *First Springfield Bank & Trust*, 188 Ill. 2d at 256 ("To recover damages based upon a defendant's alleged statutory violation, a plaintiff must show that *** (3) the violation proximately caused her injury."). For example, if a general order required an officer to wear a blue hat in a pursuit and she was wearing green, the violation of the general order would have nothing to do with the accident. So too in this case, permission or lack thereof, had absolutely nothing to do with Lee's driving that evening, and

this accident would have occurred whether or not permission had been requested or given. As for her presence on the road, there is no evidence that permission would have been denied if requested, so it is reasonable to assume she would have been there and the accident would have occurred. Moreover, her presence on the road is not an issue because it is impermissible to reason back to infinity to establish probable cause, *i.e.*, if Officer Lee had never been born, the accident would not have occurred either. See *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928) (Cardozo, C.J.).

Because the violation of the general order is not in this case proximately related to the occurrence, the jury would then have had to have based its decision that Lee was willful and wanton on her conduct alone. As previously noted, the crux of this allegedly willful and wanton conduct on the part of Officer Lee is that, going at or slightly above the speed limit,[8] if one believes witness Denise Patrick's testimony perhaps enhanced by four drinks and many obstacles blocking her view.[9]

_____

[8] I am not "excusing" a speed above the limit, as the majority states, and indeed no excuse is needed for an officer in these circumstances. In an emergency, an officer may exceed the speed limit if such will not endanger others and can reasonably expect citizens to clear the way pursuant to statute. 625 ILCS 5/11-205(c), -907(a) (West 2004). There would be no reason for Officer Lee to think a slightly elevated speed in virtually ideal driving conditions that evening would pose a danger.

[9] I am well aware the jury may accept Patrick's testimony, but in this case, I would deem acceptance of such flawed testimony more evidence that this verdict is the result of bias against the City. Patrick admitted to having had four shots. She was viewing the scene from a street above the Eisenhower and looking across many lanes of traffic, after dark with the bright lights of

84

The night was clear and dry, the road well-lit, her emergency equipment was activated, her turn signal was on, she checked her mirrors, and she was responding to an emergency. Lee changed lanes twice, and Patrick said that Lee moved from the far left lane to the far right lane (two lanes), colliding with Hudson's car. Officer Lee's testimony was that after she merged from the second lane into the right lane, Hudson's car came from the shoulder into her lane, and that although she slammed on the brakes, she was unable to avoid hitting him. There was no testimony rebutting Officer Lee's statement that she sought to avoid colliding with Hudson's vehicle, and that would be a ridiculous assumption, given that she and her partner were in the car. I also point out that the officer safely traversed both lanes and would have gone directly forward if Mr. Hudson's car had not been protruding into her lane either because he failed to fully pull over or was pulling out in front of Lee. Taken as a whole, then, this testimony does not even come close to a conscious disregard for the safety of others or the degree of moral blame attached to intentional harm. *Moran v. City of Chicago*, 286 Ill. App. 3d 444, 452 (1997); see also 745 ILCS 10/1-210 (West 2004). The fact that her turn signal was on, her emergency equipment was activated and that she braked in an attempt to avoid the collision, in fact, shows just the opposite—a conscious regard for the safety of others. Therefore, neither the violation of the general order nor the conduct itself could be evidence of anything other than negligence, if that. If the jury found otherwise, they were wrong because such a conclusion is against the manifest weight of the evidence. *York*, 222 Ill. 2d at 178.

---

the roadway and the "el" platform. It is not surprising that she was able to see the blue lights and hear Lee's siren, under these circumstances, but other evidence she offers seems very questionable–elevated speed, "jumping," etc.

*Bosen v. City of Collinsville*, 166 Ill. App. 3d 848 (1987), presents a similar situation, although this case is a stronger one for not finding willful and wanton conduct. In *Bosen*, a police officer responded to a burglar alarm at a private residence. *Bosen*, 166 Ill. App. 3d at 849. Traffic was heavy and the pavement wet, and the officer activated his emergency lights and used his siren intermittently as he drove. *Bosen*, 166 Ill. App. 3d at 849. At an intersection, the officer noticed another car crossing in front of him. *Bosen*, 166 Ill. App. 3d at 849. While he tried to avoid colliding with the other car, he could not. *Bosen*, 166 Ill. App. 3d at 849. The court found that the officer had been driving in excess of the speed limit, but it nonetheless concluded that the officer's actions were not willful and wanton. *Bosen*, 166 Ill. App. 3d at 849-50. In reaching this conclusion, the court noted that the officer was using his emergency lights and his siren intermittently, and sought to avoid the collision. *Bosen*, 166 Ill. App. 3d at 850. Even though he was unable to do so, that was merely negligence. *Bosen*, 166 Ill. App. 3d at 850.

Unlike in *Bosen*, driving conditions in the instant case were virtually ideal, and Lee had taken every precaution prior to executing her lane change. Like the officer in *Bosen*, Lee slammed on her brakes to avoid a collision but was unable to do so. Thus, the case at bar is virtually indistinguishable from *Bosen* and the officer's conduct cannot be considered willful and wanton. Even where the evidence is viewed in the light most favorable to plaintiff, a judgment *n.o.v.* should have been granted.

Similarly, in *Sanders v. City of Chicago*, 306 Ill. App. 3d 356 (1999), the defendant police officer heard an emergency call that two fellow officers were being attacked at a location outside of the defendant officer's beat. *Sanders*, 306 Ill. App. 3d at 359. Without requesting permission to do so, the officer left his beat and proceeded to the location of the attack. *Sanders*, 306 Ill. App. 3d at

359. While *en route*, he heard that the suspect had been cornered but not yet searched. *Sanders*, 306 Ill. App. 3d at 359. The defendant officer observed stopped traffic in his lane of travel, switched to the opposite lane in order to reach the scene more rapidly, and struck a pedestrian, who ultimately died. *Sanders*, 306 Ill. App. 3d at 359-60. The defendant officer claimed not to have heard a radio dispatch that no further help was needed. *Sanders*, 306 Ill. App. 3d at 359.

Despite traveling in the wrong lane of travel, being outside his regular beat, and the fact that the accident occurred after the suspect had been cornered, the court affirmed the jury's finding the officer did not act in a willful and wanton manner. *Sanders*, 306 Ill. App. 3d at 367. The court noted that, although the officer entered the wrong traffic lane, he was responding to an emergency call from fellow officers, and prior to entering the wrong lane, the officer activated his siren, slowed down, and ensured there were no cars coming in the opposite direction. *Sanders*, 306 Ill. App. 3d at 367.

In the instant case, unlike *Sanders*, the emergency was ongoing at the time of the accident, and both Officer Lee and the officer in *Sanders* were involved in serious accidents while responding to the information they received over their radios, but the evidence is clear that Lee's turn signal and emergency equipment were activated. The officer in *Sanders*, however, was found not to have acted in a willful and wanton manner, and given this evidence, this should have been the finding here.

JURY INSTRUCTION

Nonetheless, the jury did find the above conduct to be willful and wanton. In my view, this finding is easily attributable to the erroneous issues instruction they were given as well as plaintiff's expert's video discussed below. The instruction reflected plaintiff's complaint as to what he maintained officers had done in a willful and wanton manner. As previously stated, most of the

conduct can only be described as simple negligence, (see, notably counts a, c, e, f, and g); the remaining allegations allege violations of general orders regarding pursuit (b, c, h, & j), which if proven, are not even negligence *per se*.

I am fully aware of the well-established rule that what a jury deems willful and wanton must be decided by the circumstances of each case and what may only amount to negligence in one case may be willful and wanton in another. *Streeter v. Humrichouse*, 357 Ill. 234, 238 (1934). However, there is a qualitative difference between negligence and willful and wanton conduct that always differentiates the two: negligence never has the intentional or quasi-intentional character of willful and wanton conduct. See *Murray*, 224 Ill. 2d at 237, quoting *Burke*, 148 Ill. 2d at 450. For this reason, a jury may not link two (or ten, for that matter) negligent acts and say that, combined, they amount to willful and wanton. "Willful and wanton" is a different animal. See generally, *Burke*, 148 Ill. 2d at 450. The jury appears to have ignored this qualitative difference here. If they found a lack of "due care" and / or "changing lanes" (or some combination thereof) to be willful and wanton, they were simply wrong.

I am also aware that this jury was properly instructed as to what actually *does* constitute willful and wanton conduct as the majority notes. However, they were then confronted by an instruction that had a laundry list of things which plaintiff claimed to *be* willful and wanton conduct, but were in reality only negligent acts. There is no reason to assume that they were able to discern that these acts, alleged in the instruction to be willful and wanton, were actually only negligence. Therefore, there can be no confidence in their conclusions.

This is especially true of those subparagraphs containing alleged violations of general orders.

I doubt that it would surprise anyone if the average juror would equate a violation of a general order with willful and wanton conduct. Nonetheless, our courts in Illinois have repeatedly held that a violation of an organization's internal standards are not even negligence *per se*, let alone willful and wanton conduct *per se*, reasoning that they do not impose legal duties. *Morton*, 283 Ill. App. 3d at 454. See also *Floyd v. Rockford Park District*, 355 Ill. App. 3d 695, 702 (2005) (holding that a public entity's violation of its own rules does not constitute proof of negligence much less willful and wanton conduct). Indeed, this trial court early on properly granted the City's motion *in limine* to prevent plaintiff's counsel from arguing that a violation of a general order was willful and wanton conduct *per se*. They were nonetheless provided with an instruction that implied that it was.

I agree with the City that this jury was likely confused by the list of what plaintiff claimed to be willful and wanton conduct and an incorrect assumption that a violation of a general order is willful and wanton behavior on the part of a police officer. This instruction was thus highly prejudicial to the City and may have tipped the balance in plaintiff's favor in this close case. *N.W.I. International, Inc. v. Edgewood Bank*, 291 Ill. App. 3d 247, 258 (1997). Moreover, even if any of the subparagraphs of plaintiff's complaint properly described willful and wanton conduct, most could only be considered mere negligence, and we will never know upon which one or ones the jury relied in reaching the verdict. Where a jury is instructed that it may find the defendant liable for acts which legally cannot be the basis of liability, then any resultant verdict must be set aside even if other theories were properly before the jury. *Darby v. Checker Co.*, 6 Ill. App. 3d 188 (1972).

The majority claims that the City has waived the instruction issue because they failed to proffer an instruction which pointed out the defect and gave a correct instruction. I note that waiver

is a limitation on the parties, not on this court and we may dispense with waiver when the interests of justice so demand. *In re Estate of Funk*, 221 Ill. 2d 30, 97 (2006); see also *Mellon v. Coffelt*, 313 Ill. App. 3d 619, 626 (2000) (holding that, "in the interest of justice," the court would review a waived argument on appeal from a motion to dismiss). This is such a case, and the City is entitled to a new trial on this issue.

ADMISSION OF THE VIDEO

The City contends on appeal, and I agree, that it is entitled to a new trial because a video created by plaintiff's expert, Doctor Ziejewski, was erroneously admitted. I note that a video is a most powerful piece of evidence, perhaps disproportionately so—an observation requiring no citation, in my view. The doctor presented this film to the jury as though it was a mathematically and scientifically accurate representation of what occurred the evening of May 7th, based on the immutable laws of physics. He even made it clear that his production was not an "animation" because they were similar to cartoons with no science behind them. Doctor Ziejewski also suggested that the computer would solve "all equations," implying it would fill in the blanks. In reality, it was Doctor Ziejewski who filled them in.

There are at least six important facts which the expert seemed to literally invent, since either there was no testimony about these at trial or the trial testimony is directly contradictory to his video. These briefly are: (i) the expert used the wrong make and model of vehicle (though the right one was surely available); (ii) the simulation starts with Hudson's vehicle going straight, despite testimony it was going to the right; (iii) Officer Lee's vehicle starts at ten degrees off due West, despite there being no testimony to that effect; (iv) Officer Lee's vehicle spun 180 degrees around before the

impact, despite there being no supporting testimony; (v) her brakes were applied in a certain manner (50% to the front, 100% to the rear), absent any evidence; and (vi) Hudson steered his car to the right after impact, without any testimony to this effect. None of the above was contained in the evidence and Dr. Ziejewski even admitted that when he had "to introduce dynamic instability" in order to have the police car spinning out of control across the highway absent any testimony that it was, he interjected or invented the locking brake theory, though he did not know if the brakes actually did lock or if the police car had locking brakes. In fact, since there were no materials regarding skid marks, etc., Ziejewski did no more than look at pictures of damage to the cars.

*French v. City of Springfield*, 65 Ill. 2d 74 (1976), is instructive on this issue. In *French*, the court remanded for a new trial where a video was improperly introduced. *French*, 65 Ill. 2d at 81-82. The plaintiff claimed it was proffered merely to acquaint the jury with the area, but the court held it was meant to be a representation of what actually occurred and contained material mistakes. *French*, 65 Ill. 2d at 81-82. In our case, the admission was more clearly in error because Dr. Ziejewski *said* it was a representation of what occurred, not a simulation, and made no bones about his opinion that this presentation was a bullet proof recreation of the accident based on scientific principles. Thus, the instant case is even more compelling than *French*.

*Hiscott v. Peters*, 324 Ill. App. 3d 114 (2001) is also on point, but again the instant case is far more dramatic in terms of missing or false "facts." In *Hiscott*, the expert stated that the defendant's car went into a "yaw" once it left the gravel shoulder and returned to the pavement, although there was no physical evidence to support that opinion. *Hiscott*, 324 Ill. App. 3d at 119. The appellate court held there was no evidence of yawing or that the defendant was braking at the

time of the accident. *Hiscott*, 324 Ill. App. 3d at 123-24. In our case, the expert injected not one or two, but six "facts" into his video which are wholly unsupported by the evidence and / or contradict it.

The majority attempts to distinguish *Hiscott* by saying that in *Hiscott* there was "insufficient" evidence of the expert's theory, but in this case, all the missing facts could be found inferentially in other evidence introduced at trial. In my view, the connections that the majority seeks to make between these missing "facts" and other evidence in the record are entirely improper in that they are well beyond what might be fairly considered reasonable inferences from the evidence, and must themselves be the subject of expert testimony. See *Wade v. City of Chicago Heights*, 295 Ill. App. 3d 873, 882 (1998) (holding that expert testimony is proper where the evidence offers " 'knowledge and application of principles of science beyond the ken of the average juror.' "), quoting *Zavala v. Powermatic, Inc.*, 167 Ill. 2d 542, 546 (1995); see also *Compton v. Ubilluz*, 353 Ill. App. 3d 863, 867 (2004) ("Evidence is 'beyond the ken' of the average juror when it involves knowledge or experience that a juror generally lacks.").

For example, the majority asserts that Dr. Ziejewski's statement that Officer Lee made a "hard right turn" prior to the collision is supported by Patrick's testimony that the vehicle "jumped" across the lanes. As previously discussed, there are varying definitions of "jumping," and we, therefore, do not even know what it means. Moreover, "jumping" does not provide corroboration of anything, let alone a hard right turn. The purported hard right turn was literally made up by the expert; further, any connection that might exist between "jumping" and turns is outside the knowledge of the average layman, and must be offered by an expert.

Next, the majority states that Ziejewski's injection of the 180 degree spin across the highway finds corroboration in the fact that the police car came to rest facing Hudson's car. Aside from the fact that there was no evidence of a spinning police car from anyone *but* the expert, a more reasonable conclusion was that the police car simply was turned around by this hard impact. Third, as though it has established a fact with its 180 degree hypothesis, the majority concludes that the application and locking of Officer Lee's brakes—found nowhere in the evidence—is borne out by the fact that the police car traveled across three lanes and *spun 180 degrees*. Clearly, she could travel across three lanes wholly absent locking brakes and may well have. Moreover, the officers denied any spinning until impact and no one saw the police car spinning across the lanes.

Because I am not an expert, I haven't any idea if a hard right turn is corroborated by "jumping," whether the direction the police car faced postaccident had anything to do with a 180 degree spin, or whether this alleged spin means that Officer Lee's brakes locked. In my view, such conclusions are well beyond a "reasonable inference from the evidence," and are purely a matter for expert testimony. These may not properly be offered by the majority as a reason to justify the fact that this expert drew conclusions either absent evidence or in derogation of it. The missing "facts" are thus not in the evidence either directly or inferentially; therefore, this video lacked foundation and was erroneously admitted, requiring a new trial. *French* and *Hiscott* are directly on point, and if they are correctly decided, then this case is not, at least on the issue of the video. I further agree with the City that along with the erroneous instruction, this video was very influential in the jury's conclusion that the officer's conduct was willful and wanton.

For the foregoing reasons, I respectfully dissent.